# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-40836

United States Court of Appeals
Fifth Circuit

**FILED**

November 9, 2016

Lyle W. Cayce
Clerk

BRUCE M. ANDERSON,

      Plaintiff - Appellee

v.

ROGELIO VALDEZ, In his Individual and Official Capacities,

      Defendant - Appellant

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 2:14-CV-426

Before JONES, WIENER, and HIGGINSON, Circuit Judges.

WIENER, Circuit Judge*

Plaintiff-Appellee Bruce M. Anderson brought this action against Defendant-Appellant, Chief Justice Rogelio Valdez of the Texas Thirteenth Court of Appeals ("Thirteenth Court"), asserting an individual and official capacity claim under 42 U.S.C. § 1983. Anderson alleges that, after he sent a letter to the Texas Supreme Court and filed a disciplinary complaint with the State Commission on Judicial Conduct describing what he believed to be

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 15-40836

malfeasance by Chief Justice Valdez, Valdez prevented another justice on the Thirteenth Court from hiring Anderson as a "briefing attorney," *viz.*, a law clerk. He further alleges that, in so doing, Valdez retaliated against him for exercising his right to free speech under the First Amendment. Valdez moved to dismiss, asserting that Anderson had failed to state a claim and that Valdez is entitled to qualified immunity. The district court denied the motion, and Valdez timely filed an interlocutory appeal pursuant to the collateral order doctrine.

I.

FACTS & PROCEEDINGS

A.   FACTS

Anderson, who has been licensed to practice law in the state of Texas since 1984, served as an assistant district attorney in Hidalgo County before being hired as a briefing attorney at the Thirteenth Court in 1988. Anderson alleges that, "[b]ecause of [his] productivity and success,"[1] he was later promoted to the position of senior briefing attorney and then to that of research attorney. In 1996, J. Bonner Dorsey, another justice on the Thirteenth Court, hired Anderson as a staff attorney. Justice Dorsey retired in 2002, after which Anderson left the court to serve as an assistant district attorney, this time in Nueces County.

Early in 2007, Rose Vela, yet another justice of the Thirteenth Court, hired Anderson as her briefing attorney. He remained in that position until she retired in late 2012. Anderson alleges that, as Justice Vela's briefing attorney, his "job duties included researching and writing memoranda on appeals and original proceedings pending before the Thirteenth Court,

---

[1] The facts—and quoted language—constitute Anderson's allegations. In this posture, we assume that those allegations are true.

2

participating in case conferences, making recommendations to Justice Vela regarding pending motions, and performing routine administrative duties." He expressly alleges that his "official duties" did not include reporting judicial malfeasance by a justice on that court to the Texas Supreme Court or to the State Commission on Judicial Conduct.

According to Anderson, "[i]n early 2012, Justice Vela asked Anderson to come into her office for a meeting." "During this meeting, [she] told Anderson that she had concerns about the conduct of . . . [Chief Justice] Valdez." Specifically, "Vela told Anderson that she had examined the [Thirteenth] Court's financial records concerning its Filing Fee Fund and . . . Valdez's campaign finance records, and concluded that . . . Valdez had been obtaining double reimbursements from both the [Thirteenth] Court's Filing Fee Fund and his political campaign for the same travel expenses." She explained that "[t]hese records demonstrated that, on ten different occasions, [Valdez] posted the same travel expenses to both his political campaign and the [Thirteenth] Court's Filing Fee Fund." "Because of Anderson's experience in criminal law, Justice Vela asked Anderson whether, in Anderson's personal opinion, Valdez's conduct violated any [Texas] laws." He told her that he believed it had. Vela, however, "did not report, nor ask Anderson to report, [Valdez] to the authorities."

But Anderson alleges that he "was disturbed by the possibility that [Valdez, the chief justice,] had violated Texas law," so he sent a letter "on his own initiative" to Wallace Jefferson, then the chief justice of the Texas Supreme Court, in late 2012. Anderson asserts that, in that letter, he told Chief Justice Jefferson "that he had 'concerns [about] the possible violation of the Texas Penal Code by . . . Valdez' . . . . and that . . . he 'did not know who else to report it to.'" He asked Chief Justice Jefferson to provide him with the name of

the individual or entity "responsible for investigating such allegations" and "to keep the letter confidential because [he] was concerned that he would be retaliated against if anyone at the Thirteenth Court . . . learned that he 'was revealing possible damaging information about . . . Valdez's handling of the court's finances.'"

About one week later, Jennifer L. Cafferty, general counsel to the Texas Supreme Court, responded to Anderson's letter to Chief Justice Jefferson, "inform[ing] him that his concerns about . . . Valdez may be reported to the State Commission on Judicial Conduct and/or local law enforcement." A week or so after that, "Anderson sent a letter to the State Commission on Judicial Conduct." The letter to the Commission was "nearly identical" to that he had sent to Chief Justice Jefferson. The commission responded a few weeks later, "indicat[ing] that it would commence an investigation into the allegations contained in Anderson's letter" (that is, the disciplinary complaint).

In early 2013, Royce LeMoine, an investigator with the Commission, contacted Vela, who had since retired as a justice, "to inquire whether she had information relating to [Valdez's] charging duplicate expenses to both the taxpayer-funded account of the Thirteenth Court and his political campaign fund." Vela responded to LeMoine soon after and "provided him with various documents supporting her belief that [Valdez] had obtained double reimbursements." The Commission "then referred the matter" to the district attorney in Travis County "for potential prosecution." (As of early 2015, the Commission's investigation was still "ongoing.")

Early in 2014, Anderson applied to Justice Gregory T. Perkes, also on the Thirteenth Court, to serve as his senior briefing attorney. On May 2, 2014, Anderson interviewed with Perkes. Anderson alleges that Perkes told him that "he was the most qualified of all the applicants" and that "'the job [was his] if

[he] want[ed] it.'" Anderson says that he "quickly replied," telling Perkes that he would "take it." Anderson stresses that "Perkes and [he] then agreed that [he] would start on May 12" and also agreed on his compensation. He also indicates that, soon afterward, Perkes e-mailed the other justices "to inform them of his hiring decision, stating 'I am hiring Bruce Anderson as my Senior Staff Attorney.'"

Anderson asserts that "the [Thirteenth] Court's practice and procedure . . . allow[ed] each justice to mak[e] all [their own] hiring decisions related to their individual chambers" and there had been no "other occasion when one [justice] was permitted to interfere with another [justice]'s hiring decisions." Anderson further asserts that, despite this, "[Valdez] told all of the [j]ustices not to allow Anderson to work for Justice Perkes." He said that he did so "because Anderson had filed a complaint against [him] with the State Commission on Judicial Conduct." After Valdez became aware that "Perkes had hired Anderson," Valdez "began searching for excuses to interfere with Anderson's hiring." This included "ask[ing] a [Thirteenth Court] employee to research [the] opinions" Anderson had written "while he worked for the Thirteenth Court" and to "look into the other applicants for the position" with Perkes. "Valdez [also] convened a meeting, wherein he asked all six justices on the Thirteenth Court of Appeals to vote on whether Anderson should be permitted to work for Justice Perkes."

Anderson contends that, on May 8, several days before Anderson was to start working for Perkes, he "received a call from an agent of the Thirteenth Court, who informed him that despite his acceptance of Justice Perkes's offer on May 2, [he] did not have a job with the Court." Although "[t]he agent did not provide any reason . . . , [i]t [was] clear" that Valdez "had knowledge that Anderson [had] filed a complaint against [him] with the State Commission on

Judicial Conduct and that [Valdez] interfered in Anderson's hiring because of the [disciplinary] complaint." In an e-mail, Valdez told staff at the Thirteenth Court to "call [him] to address [*his*] decision on [Anderson]." The following day, May 9, "Justice Perkes texted former Justice Vela, '[Valdez] went to war over Bruce [Anderson] and all of the rest of the justices cowtowed to [his] wishes.'" When Vela asked the reason, "Justice Perkes responded that 'the only thing I can think of is that he got wind of [Anderson] and the investigation.'"

B.     PROCEEDINGS

Anderson filed this suit against Valdez in his individual and official capacities under 42 U.S.C. § 1983, alleging that he violated Anderson's right to free speech. Anderson specifically alleged that Valdez's refusal to allow Perkes to hire him constituted retaliation for the complaints he had made to the Texas Supreme Court and the State Commission on Judicial Conduct.

Valdez then moved to dismiss. Anderson responded in opposition and also requested leave to amend his complaint. Valdez opposed the request. The district court granted Anderson leave to amend and denied Valdez's motion to dismiss as moot. Valdez then moved to dismiss the amended complaint, and Anderson again responded in opposition. The district court granted Valdez's motion as to Anderson's request for declaratory relief, but otherwise denied it on its merits. Valdez timely filed a notice of interlocutory appeal.

II.

ANALYSIS

A.     JURISDICTION

Valdez contends that, in resolving his motion to dismiss, the district court erred in determining that Anderson had stated a claim against him and that he could not avail himself of a qualified immunity defense. We have jurisdiction over an interlocutory appeal of a district court's denial of qualified

immunity pursuant to the collateral order doctrine.[2] We have pendant appellate jurisdiction "in rare and unique circumstances where a final appealable order is 'inextricably intertwined' with an unappealable order or where review of the unappealable order is necessary to ensure meaningful review of the appealable order."[3] Because the district court's determination regarding Valdez's defense depended on its determination that Anderson had adequately stated a claim for retaliation, we exercise jurisdiction over both.

B.    STANDARD OF REVIEW

We review a district court's ruling on a motion to dismiss de novo, "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs."[4] To prevail against a defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's complaint "must contain sufficient factual matter, [if] accepted as true, to 'state a claim to relief that is plausible on its face.'"[5] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[6] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory [*sic*] statements, do not suffice."[7] Although a complaint "does not need detailed factual allegations," the "allegations must be enough to raise a right to relief

---

[2] *See Zarnow v. City of Wichita Falls, Tex.*, 500 F.3d 401, 406 (5th Cir. 2007) ("Denial of . . . qualified immunity grounds typically falls within the collateral order doctrine, an exception to the final judgment rule.").

[3] *Thornton v. Gen. Motors Corp.*, 136 F.3d 450, 453 (5th Cir. 1998).

[4] *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (internal quotation marks omitted).

[5] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[6] *Id.*

[7] *Id.*

above the speculative level."[8] "[C]onclus[ional] allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."[9] Further, "[w]hen reviewing a denial of qualified immunity on an interlocutory appeal, we are restricted to determinations 'of question[s] of law' and 'legal issues,' and we do not consider 'the correctness of the plaintiff's version of the facts.'"[10] "Only these issues of law qualify as appealable 'final decisions' before a final judgment."[11]

## C.    CLAIM

As a preliminary matter, Valdez suggests that Anderson's claim is subject to a heightened pleading standard because Valdez's Rule 12(b)(6) motion to dismiss asserts a defense of qualified immunity. But, as Anderson correctly notes, Valdez misconstrues this court's precedent in *Shultea v. Wood*.[12] We explained in *Shultea* that when, as here, a qualified immunity defense is asserted in an answer or motion to dismiss, "the district court must"—as always—do no more than determine whether the plaintiff has "file[d] a short and plain statement of his complaint, a statement that rests on more than conclusions alone."[13] In so doing, we expressly required the district court to apply "Rule 8(a)(2)'s 'short and plain' standard" to the complaint.[14] After applying this general pleading standard to the complaint, "the court *may*

---

[8] *Twombly*, 550 U.S. at 555 (citation omitted).

[9] *Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 439 (5th Cir. 2009) (quoting *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278 (5th Cir. 1993)).

[10] *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 251–52 (5th Cir. 2005) (second alteration in original) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985)).

[11] *Id.* at 252.

[12] *Shultea v. Wood*, 47 F.3d 1427 (5th Cir. 1995).

[13] *Id.* at 1433.

[14] *Id.*

No. 15-40836

[*then*], *in its discretion*, insist that a plaintiff file a reply tailored to [the defendant's] answer [or motion to dismiss] pleading the defense of qualified immunity."[15] Even if the district court does so insist, *Shultea* requires it to apply the Rule 8(e)(1)'s standard to the reply, emphasizing that it is "[t]he only . . . Rule that governs the content of . . . replies." Unlike Rule 8(a)(2), Rule 8(e)(1) "demands that '[e]ach averment of a pleading shall be simple, concise, and direct.'"[16] *Shultea* further clarifies that the heightened pleading standard derived from Rule 9 does not apply to the complaint or to any reply merely because an answer or motion to dismiss asserts a defense of qualified immunity.[17] We therefore apply the general pleading standard derived from Rule 8(a)(2) in considering whether a plaintiff has stated a retaliation claim.[18]

In applying that general pleading standard, we consider whether Anderson has, in fact, stated such a claim. "To establish a § 1983 claim for employment retaliation related to speech, a plaintiff-employee must show: (1) he suffered an adverse employment action; (2) he spoke as a citizen on a matter of public concern; (3) his interest in the speech outweighs the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action."[19]

---

[15] *Id.* at 1433–34 (emphasis added).

[16] *Id.* at 1433 (quoting FED. R. CIV. P. 8(e)(1)).

[17] *Id.* at 1434. Stated differently, even though the complaint and any reply are subject to distinct standards, neither standard is altered when a defendant files a responsive pleading asserting a qualified immunity defense.

[18] *See Cox v. Kaelin,* 577 F. App'x 306, 312–13 (5th Cir. 2014) (unpublished) ("Regarding [the defendant's] claimed defense of qualified immunity, he argues that a heightened pleading standard applies when the defense of qualified immunity is asserted, relying on *Schultea v. Wood*. [His] argument, however, misreads this Court's opinion in that case." (citation omitted)).

[19] *Nixon v. City of Houston*, 511 F.3d 494, 497 (5th Cir. 2007) (citations omitted) (internal quotation marks omitted).

No. 15-40836

We begin by addressing the fourth element, *viz.*, whether Anderson's speech precipitated the adverse employment action. We then proceed to the second and third elements, *viz.*, whether Anderson spoke as a citizen on a matter of public concern and—if so—whether his interest in that speech outweighed the government's interest. We need not address the first element, *viz.*, whether Anderson suffered an adverse employment action, because Valdez does not contest it.[20]

1.    FOURTH ELEMENT

Valdez argues that Anderson has not satisfied the fourth element of his retaliation claim because he failed to allege that Valdez knew Anderson had written a letter to the Texas Supreme Court or had filed a disciplinary complaint with the State Commission on Judicial Conduct which discussed Valdez's purported malfeasance. Yet, even a cursory reading of the complaint demonstrates that Anderson has adequately alleged that Valdez knew of Anderson's letter and complaint. In fact, Anderson expressly alleged that Valdez "had knowledge that Anderson filed a complaint against [Valdez] with the State Commission on Judicial Conduct . . . ." He further pleaded that, according to Justice Perkes, "because Anderson had filed a complaint against [Valdez] with the State Commission on Judicial Conduct, [Valdez] told all of the Justices not to allow Anderson to work for [Perkes]."[21] He also alleged that, even though each justice was entitled to hire his or her own staff, Valdez

---

[20] In any event, "[a]dverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands." *Breaux v. City of Garland*, 205 F.3d 150, 157 (5th Cir. 2000) (quoting *Pierce v. Tex. Dep't of Criminal Justice, Institutional Div.*, 37 F.3d 1146, 1149 (5th Cir. 1994)). The action here qualifies because Valdez blocked Anderson's being hired.

[21] Anderson also alleges: "On May 9, 2014, Justice Perkes texted former Justice Vela, "Roy [Valdez] went to war over Bruce [Anderson] and all of the rest of the justices cowtowed to Roy's wishes." (alterations in original). Taken as true, this merely suggests that Perkes assumed that Valdez knew about Anderson's letter and complaint on May 9, 2014.

interfered with Perkes's decision to do so and that this was Valdez's decision alone. When all of these contentions are accepted as true, they clearly demonstrate that Chief Justice Valdez knew of the disciplinary complaint. Anderson is not required to allege *how* Valdez knew, only *that* he knew.[22]

Despite this, Valdez also contends that when Anderson's allegations that the letter and disciplinary complaint were confidential are taken as true, they foreclose the possibility that Valdez could have known about them. In particular, Valdez states that, by "admit[ing] that [Anderson] asked Chief Justice Jefferson to keep his letter confidential and fail[ing] to allege that his letter was known to anyone other than Chief Justice Jefferson and [the Texas] Supreme Court's General Counsel," he consequentially admits that Valdez did not know about the letter. Valdez further asserts that "the mere *possibility* that . . . [he] *could* [have] learn[ed] of Anderson's [disciplinary] complaint to the State Commission on Judicial Conduct is not sufficient to nudge Anderson's allegations over the line from possibility to plausibility." Anderson, of course, disputes all of this.

Valdez misses the mark. With regard to the letter, Anderson's allegation is that he *asked* Chief Justice Jefferson to keep the letter confidential, not that Chief Justice Jefferson actually did so. In fact, Anderson alleged that Chief Justice Jefferson did not answer the letter himself, establishing that the letter had not remained confidential.

With regard to the disciplinary complaint, Valdez contends that Texas law requires the Commission on Judicial Conduct to keep such complaints confidential. But this misstates that law. Although "the papers filed with and proceedings before the commission are confidential prior to the filing of formal

---

[22] *See Cox*, 577 F. App'x at 312 ("[The employee] pleads that his [speech] was 'known,' and thus it is plausible that his [speech] motivated his eventual termination.").

charges," this is subject to specified exceptions.[23] One such exception states: "On the filing of a written request by a judge, the commission may release to the person designated in the request, including the judge, the number, nature, and disposition of a complaint filed against the judge with the commission . . . ."[24] "[T]he commission *may*"—but is not required to—"refuse to release the identity of a complainant" if such a request is made.[25] Likewise, "the commission *may*"—but is not required to—"keep the complainant's identity confidential" if the complainant so requests.[26] At most, this establishes a process that the State Commission on Judicial Conduct is instructed to follow, not the process that it *did* follow. As with the letter, Anderson has not alleged that the State Commission on Judicial Conduct did, in fact, keep the complaint confidential.[27]

Anderson was not required to allege *how* Valdez knew of the letter and complaint,[28] only that Valdez knew. Having done so, he has sufficiently pleaded that his letter and his disciplinary complaint precipitated Valdez's allegedly untoward conduct.

2.    SECOND & THIRD ELEMENTS

Valdez next asserts that Anderson is unable to satisfy the second and third elements of his retaliation claim, *viz.*, whether Anderson spoke as a

---

[23] TEX. GOV'T CODE ANN. § 33.032(a).

[24] *Id.* § 33.032(e).

[25] *Id.* (emphasis added).

[26] *Id.* § 33.0321 (emphasis added).

[27] Even if Anderson had alleged that the State Commission on Judicial Conduct kept the complaint confidential, Anderson also alleges that others—including Vela, Perkes, Cafferty, Lemoine, and the Travis County District Attorney's Office—were aware of it. Valez may have become aware of it from any of them, as well.

[28] *See Cox*, 577 F. App'x at 312 ("[The employee] pleads that his [speech] was 'known,' and thus it is plausible that his [speech] motivated his eventual termination.").

12

No. 15-40836

citizen on a matter of public concern and—if so—whether his interest in that speech outweighed the government's interest. Valdez claims that, by sending the letter and filing the complaint, Anderson was acting pursuant to his official duties as a public employee, so his speech was unprotected. Valdez suggests more specifically that Anderson's ethical duties as a lawyer—including his duty to report malfeasance—were incorporated into his official duties as a public employee. Anderson disputes this.

In *Pickering v. Board of Education*, the Supreme Court noted that "[t]he problem in any case is to arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the [public employer], as an employer, in promoting the efficiency of the public services it performs through its employees."[29] Before balancing those interests, however, it is necessary to engage in a threshold inquiry regarding whether the public employee spoke as a citizen at all. This question is resolved with reference to *Garcetti v. Ceballos*,[30] in which the Supreme Court adjured that, "when public employees [speak] pursuant to their official duties, [they] are not speaking as citizens . . . ."[31] Such "[j]ob-required speech is not protected," even when it irrefutably addresses a matter of public concern.[32]

*Garcetti* begins by recognizing that "public employees do not surrender all their First Amendment rights by reason of their employment."[33] It then

---

[29] 391 U.S. 563, 568 (1968).

[30] 547 U.S. 410, 419 (2006).

[31] *Id.* at 421.

[32] *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 692–93 (5th Cir. 2007) ("*Pickering*, however, is now inapposite. The Supreme Court's recent pronouncement in *Garcetti v. Ceballos* added a threshold layer to the *Pickering* balancing test. Under *Garcetti*, we must shift our focus from the content of the speech to the role the speaker occupied when he said it." (citation omitted)).

[33] *Garcetti*, 547 U.S. at 417.

explains that there are "two inquiries to guide interpretation of the constitutional protections accorded to public employee speech"[34]: (1) "whether the employee spoke as a citizen on a matter of public concern"[35] and, if so, (2) "whether the [public employer] had an adequate justification for treating the employee differently from any other member of the general public."[36]

*Garcetti* notes that the "overarching objectives" of these inquiries "are evident."[37] "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom."[38] This is because the public employer, like any principal, has an interest in controlling the activities of its agents. Those activities include the employee's speech. A public employer necessarily has an interest in (1) requiring speech by its employees that enables "the efficient provision of public services," and (2) prohibiting speech that does not, including that which "contravene[s] [the public employer's] policies or impair[s] the proper performance of [its] functions."[39] Even if the employer has such an interest, however, that interest must still be balanced against the employee's own interests: "[A] citizen who works for the government is nonetheless a citizen," and "[t]he First Amendment limits the

---

[34] *Id*. at 418 (citing *Pickering*, 391 U.S. at 574).

[35] *Id*.

[36] *Id*.

[37] *Id*.

[38] *Id*.

[39] *Id*. at 419. The latter justification appears to prevent confusion over whether a public employee who routinely speaks on behalf of the government is, in fact, speaking on behalf of the government or on his or her own behalf. As discussed *infra*, *Garcetti* expounds on this.

14

ability of a public employer . . . to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens."[40]

*Garcetti* holds that, "[w]ith these principles in mind," an employer may restrict the employee's speech only when it is made "pursuant to [the employee's] *official duties*."[41] Such a limit, it noted, is justified by the employer's interest in disciplining, *viz.*, controlling, its employees.[42] Stated differently, *Garcetti* decided that, with regard to speech *made pursuant to a public employee's official duties*, the public employer's interest automatically outweighs the employee's, which is therefore unprotected.

*Garcetti* itself noted that the scope of its holding is not limitless. For instance, a public employee does not speak pursuant to his official duties merely because he speaks while *at* work.[43] Likewise, a public employee does not speak pursuant to his official duties merely because he speaks *about* work. To the contrary, *Garcetti* reiterated that "[t]he First Amendment protects some [speech] related to the speaker's job."[44] Still further, *Garcetti* noted that a public employee does not speak pursuant to his official duties when his speech is analogous to that of a citizen's speech. In particular, *Garcetti* stated that "[w]hen a public employee speaks pursuant to employment responsibilities . . . there [will be] no relevant analogue to speech by citizens

---

[40] *Id.*

[41] *Id.* at 420–21 (emphasis added).

[42] *Id.* at 421 ("We hold that when public employees make statements pursuant to their official duties . . . the Constitution does not insulate their communications from employer discipline."); *Discipline*, MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/discipline (defining "discipline" as "control gained by enforcing obedience or order" or "a rule or system of rules governing conduct or activity").

[43] *Id.* at 420–21. While such speech might very well relate to the employee's official duties, it is not necessarily made pursuant to those duties.

[44] *Id.* at 421.

15

who are not [public] employees."[45] Accordingly, when there *is* an analogue to speech by citizens who are not public employees, the employee does not speak pursuant to his official duties, but as a citizen.[46] Speech made "outside the course of performing [the public employee's] official duties . . . is the kind of activity engaged in by citizens" and, therefore, not subject to the threshold inquiry in *Garcetti*.[47] Therefore, "[w]hen an employee speaks as a citizen, . . . the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences" under *Pickering*.[48] "When, however, the employee is simply performing his or her job duties, there is no warrant for a similar degree of scrutiny," and *Garcetti* may supplant analysis under *Pickering*.[49]

For this reason, *Garcetti*'s scope is obviously not as broad as Valdez suggests. Instead, *Garcetti* merely allows the public employer to control an employee's speech if made pursuant to the employee's official duties.[50] That is

---

[45] *Id.* at 424.

[46] In *Reilly v. City of Atlantic City*, the Third Circuit explained that, when an individual's official duties as a public employee overlap with his duties as a citizen, the individual speaks as a citizen. 532 F.3d 216, 231 (3d Cir. 2008) ("That an employee's official responsibilities provided the initial impetus to [speak] is immaterial to his/her independent obligation as a citizen . . . . When a government employee testifies truthfully, s/he is not 'simply performing his or her job duties,' rather, the employee is acting as a citizen." (quoting *Garcetti*, 547 U.S. at 423)). In *Lane v. Franks*, the Supreme Court "resolve[d] discord" between the Eleventh and Third Circuits in favor of *Reilly*. *Lane v. Franks*, 134 S. Ct. 2369, 2377 (2014).

[47] *Garcetti*, 547 U.S. at 423.

[48] *Id.*

[49] *Id.*

[50] Whether a public employee spoke pursuant to his job duties, *viz.*, as a public employee or as a citizen, is a threshold inquiry. In considering it, we do not also consider whether the employee spoke on a matter of public concern. *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 693 (5th Cir. 2007).

to say, speech is within an employer's control if it is made pursuant to the employee's official duties.

*Garcetti* repeatedly used the "speech made pursuant to the employee's official duties" formulation.[51] Even though *Garcetti* itself "did not explicate what it means to speak 'pursuant to' one's 'official duties,'" [52] it did clearly establish what it does not mean: "The [public employee's speech] concerned the subject matter of [his] employment, but this . . . is nondispositive. The First Amendment protects some expressions related to the speaker's job."[53] This was reaffirmed, not disrupted, by *Lane v. Franks*.[54]

---

[51] *See, e.g. Garcetti*, 547 U.S. at 413 ("The question presented by the instant case is whether the First Amendment protects a government employee from discipline based on *speech made pursuant to the employee's official duties*." (emphasis added)); *id.* at 421 ("The controlling factor in [the public employee's] case is that *his [speech was] made pursuant to his duties . . . .*" (emphasis added)); *id.* ("We hold that when public employees *make statements pursuant to their official duties,* the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." (emphasis added)); *id.* at 423 ("The court [below] suggested it would be inconsistent to compel public employers to tolerate certain employee speech made publicly but not *speech made pursuant to an employee's assigned duties*. This objection misconceives the theoretical underpinnings of our decisions." (citation omitted) (emphasis added)); *id.* at 424 ("When a public employee *speaks pursuant to employment responsibilities*, however, there is no relevant analogue to speech by citizens who are not government employees." (emphasis added)); *id.* ("It relates only to the expressions an employee *makes pursuant to his or her official responsibilities*, not to statements or complaints . . . that are made outside the duties of employment." (emphasis added)); *id.* ("Proper application of our precedents thus leads to the conclusion that the First Amendment does not prohibit managerial discipline based on an employee's *expressions made pursuant to official responsibilities*." (emphasis added)); *id.* at 426 ("Our precedents do not support the existence of a constitutional cause of action behind every statement a public employee *makes in the course of doing his or her job*." (emphasis added)).

[52] *Williams*, 480 F.3d at 692.

[53] *Garcetti*, 547 U.S. at 421.

[54] *Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014) ("But *Garcetti* said nothing about speech that simply relates to public employment or concerns information learned in the course of public employment. [It] made explicit that its holding did not turn on the fact that the [speech] at issue 'concerned the subject matter of [public employee's] employment,' because '[t]he First Amendment protects some expressions related to the speaker's job.' . . . "The critical question under *Garcetti* is whether the speech at issue is itself ordinarily

No. 15-40836

In *Williams v. Dallas Independent School District*, we explained that a public employee's speech is made pursuant to his official duties when that speech is "made in the course of performing his employment," whether or not that speech was specifically "demanded of him."[55] We did not, as the dissent suggests, expand this to include speech that merely *related to* the public employee's official duties, muddying the instruction in *Garcetti*.

In *Williams*, we began with a broad inquiry: "[W]e must determine the extent to which, under *Garcetti*, a public employee is protected by the First Amendment if his speech is not necessarily required by his job duties but nevertheless is *related to* his job duties."[56] Yet, we eventually adopted a much narrower holding: "We thus hold that" the public employee's speech was made "*in the course of performing his job . . . .*"[57] (This formulation is used in *Garcetti*, as well.[58]) It is therefore clear "[u]nder *Garcetti* and *Williams*, . . . that [a public employee's speech] is not protected by the First Amendment [if] it was made . . . during the course of performing his job."[59]

When the Supreme Court revisited *Garcetti* in *Lane*, it reiterated that "[t]he critical question under *Garcetti* is whether the speech at issue is itself *ordinarily* within the scope of an employee's duties, not whether it merely

within the scope of an employee's duties, not whether it merely concerns those duties." (quoting *Garcetti*, 547 U.S. at 421)).

[55] *Williams*, 480 F.3d at 694.

[56] *Id.* at 693 (emphasis added).

[57] *Id.* at 694 (emphasis added); *see Nixon v. City of Houston*, 511 F.3d 494, 498 (5th Cir. 2007) (noting that, in *Williams*, we "ultimately concluded that '[a]ctivities undertaken in the course of performing one's job are activities pursuant to official duties'" (quoting *Williams*, 430 F.3d at 694)).

[58] *Garcetti*, 547 U.S. at 423.

[59] *Nixon v. City of Houston*, 511 F.3d 494, 498 (5th Cir. 2007); *see Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008) (reiterating that "[a]ctivities undertaken in the course of performing one's job are activities pursuant to official duties . . . .").

18

concerns [*read:* relates to] those duties."[60] Although *Lane* added "ordinarily" to the formulation used in *Garcetti* and *Williams*, we have since noted that, "whatever change in the jurisprudence 'ordinary' may augur, we are unable to discern any change in *Garcetti*'s rule from *Lane* . . . , for any change resulting from *Lane* cannot be said to have been 'clearly established.'"[61]

In some instances, state law is "relevant insofar as it describes the plaintiff's position, including his duties and the way he is hired, supervised and fired."[62]  We believe it offers some insight here, as well. Texas, for instance, has adopted the *Restatement (Third) of Agency*, which explains that "[a]n employee acts within the scope of employment when performing work assigned by the employer or *engaging in a course of conduct subject to the employer's control.*"[63] It likewise provides that "[a]n employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer."[64] When an employee was not actually "performing work assigned by the employer," he nonetheless might have acted within the scope of his employment—or

---

[60] *Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014) (emphasis added).

[61] *Gibson v. Kilpatrick*, 773 F.3d 661, 669 (5th Cir. 2014).

[62] *Calderon v. Martin Cnty.*, 639 F.2d 271, 273 (5th Cir. 1981); *see Muhammad v. Dallas Cnty. Cmty. Supervision & Corr. Dep't*, 479 F.3d 377, 380 (5th Cir. 2007).

[63] RESTATEMENT (THIRD) OF AGENCY § 7.07 (2006) (emphasis added); *see Bohnsack v. Varco*, L.P., 668 F.3d 262, 273 (5th Cir. 2012).

[64] RESTATEMENT (THIRD) OF AGENCY § 7.07. The *Restatement of Employment Law* notes that the "general test of employee status" requires, in part, that "the employer controls the manner and means by which the individual renders services, or the employer otherwise effectively prevents the individual from rendering those services [independently]." RESTATEMENT OF EMPLOYMENT LAW § 1.01. "Under that test, it is generally the case that a principal with the right or ability to control how an agent's work is performed is an 'employer' and the agent is an 'employee.'" *Id.*, cmt. d.

19

pursuant to his official duties—if he was "engaging in a course of conduct subject to the employer's control."[65]

A public employee, therefore, might speak pursuant to his official duties when he does so in a course of conduct subject to the employer's control, even if the employer has not actually directed him to speak, not to speak, or how to speak. If the employer was entitled to exercise such control, the speech is made pursuant to the employee's official duties; if the employer was not entitled to exercise such control, the speech is not made pursuant to the employee's official duties. Whether the employer was entitled to control the employee's speech determines whether that speech was made pursuant to the employee's official duties.

The circumstances in *Garcetti* itself illustrate this focus on whether the employer was entitled to exercise control. There, an employer disciplined an employee for speech made pursuant to the employee's official duties as a prosecutor. The speech, a memorandum, was made for the benefit of the employer. It was, in essence, the employer's speech, not the employee's own. The employer, not the employee, was entitled to control it. Just as the employer had directed the employee to create it, the employer could also direct the employee to alter or discard it. If the employee refused, the employer was entitled to discipline him. "Restricting speech that *owes its existence* to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen."[66] Instead, "[i]t simply reflects the exercise of employer control over what the employer itself has commissioned or created."[67]

---

[65] RESTATEMENT (THIRD) OF AGENCY § 7.07.

[66] *Garcetti*, 547 U.S. at 421–22.

[67] *Id.*

No. 15-40836

As *Garcetti* explained, "[t]he controlling factor . . . is that [the public employee's] expressions were made pursuant to his duties as a [prosecutor]."[68] "[The employee] wrote his disposition memo because that is part of what he . . . was employed to do."[69] "When [the public employee] went to work and performed the tasks he was paid to perform, [he] acted as a [public] employee," not as a private citizen.[70] "*That consideration*—the fact that [the employee] spoke as a prosecutor fulfilling a responsibility [*read*: duty] to advise [his employer] about how best to proceed with a pending case—distinguishes [his] case from those in which the First Amendment provides protection against discipline."[71] The duties were created by and owed to the employer. Only a prosecutor, acting on behalf of his employer, could have created, altered, or destroyed the memorandum; a citizen could not have done so.

In contrast to the employer in *Garcetti*, Valdez had no "heightened interest[ ] in controlling [Anderson's] speech."[72] Anderson's speech was not an "[o]fficial communication[ ] [that had] official consequences," requiring anyone at the Thirteenth Court to ensure that it was "accurate, demonstrate[d] sound judgment, and promote[d] the employer's mission."[73] Instead, it was "the kind of activity engaged in by citizens"—including licensed lawyers—"who do not

---

[68] *Id.* at 421.

[69] *Id.*

[70] *Id.* at 422.

[71] *Id.* at 421 (emphasis added). That *Garcetti* refers to an "*official* duty" suggests it should be read to mean, not all duties, but those duties derived from the office (that is, the position) itself, not some extrinsic duty.

[72] *Id.* at 422.

[73] *Id.* at 422–23.

21

work for the government."[74] All lawyers, not just lawyers who are public employees, have a duty to report malfeasance.

Most notably, *Garcetti* expressly applies "only to the expressions an employee makes pursuant to his or her official responsibilities [*read*: duties], not to statements or complaints (such as those at issue in cases like *Pickering* and *Connick*) that are made outside the *duties of employment* [*read*: pursuant to his or her duties as a citizen]."[75] Such speech is *never* made pursuant to an employee's official duties. In such instances, *Garceetti* is inapplicable.

*Garcetti* emphasizes that "[e]xposing governmental inefficiency and misconduct is a matter of considerable significance."[76] "The dictates of sound judgment are reinforced by . . . whistle-blower protection laws . . . ."[77] And, further, there are "additional safeguards in the form of, for example, rules of conduct" for public employees who are also lawyers.[78] "These imperatives, as well as [other] obligations arising from any other applicable . . . mandates of the criminal and civil laws, protect employees and provide checks on [public employers] who would order unlawful or otherwise inappropriate actions."[79] This is to repeat the obvious: An employer is entitled to exercise control over an employee's speech only if it is lawful and appropriate for it to do so. If it is not lawful and appropriate for the employer to exercise control, the employee is, quite simply, not speaking pursuant to his official duties. The mandates of

---

[74] *Id.*

[75] *Id.* at 423 (emphasis added) (citing *Pickering v. Bd. of Ed.*, 391 U.S. 563, 574 (1968); *Connick v. Myers*, 461 U.S. 138, 146 (1983)).

[76] *Id.* at 425.

[77] *Id.*

[78] *Id.*

[79] *Id.* at 425–26.

those criminal and civil laws do not protect employees from discipline arising from their failure to perform unlawful or otherwise inappropriate duties; instead, they protect employees from the very existence of those duties to begin with. Such a duty is not a duty at all.[80] For instance, in *Garcetti* the public employer had permissibly disciplined its employee for speech because that speech was made pursuant to lawful and appropriate official duties. Stated differently, it was lawful and appropriate for the employer to control the employee's speech through that official duty. In holding that speech made pursuant to public employees' official duties is not protected, *Garcetti* did not alter, but embraced, the clearly established law regarding speech concerning malfeasance.

In the context of *Garcetti*'s clear instruction, Anderson's letter and disciplinary complaint were not created pursuant to his official duties. It is

---

[80] *See* RESTATEMENT (THIRD) OF AGENCY § 8.09, cmt. c ("An agent's duty to comply with instructions is not absolute. An agent has no duty to comply with instructions that may subject the agent to criminal, civil, or administrative sanctions or that exceed legal limits on the principal's right to direct action taken by the agent. Thus, an agent has no duty to comply with a directive to commit a crime or an act the agent has reason to know will be tortious. An agent who is a member of a profession does not have a duty to follow instructions given by the principal that expose the agent to discipline for violating professional rules. . . . A contract provision in which an agent promises to perform an unlawful act is unenforceable."); RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 23, cmt. c (2000) ("A contract by an agent to help the principal to perform an unlawful act is unenforceable . . . . The rule has special force when applied to lawyers. Lawyers who exercise their skill and knowledge so as to deprive others of their rights or to obstruct the legal system subvert the justifications of their calling."); *see also* WILLISTON ON CONTRACTS § 19:40 (4th ed. 2010) ("[A] promise to do an illegal thing for a legal consideration is unenforceable, and it is equally improper to promise to do a legal thing for an illegal consideration. If the agreement is bilateral and the promise on either side is unlawful, both promises are unenforceable, for one promise is itself unlawful and the other is given for unlawful consideration." (footnotes omitted)); RESTATEMENT (SECOND) OF CONTRACTS § 178(a) (1981) ("A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms."); *id.* § 179(a) ("A public policy against the enforcement of promises or other terms may be derived by the court from (a) legislation relevant to such a policy, or (b) the need to protect some aspect of the public welfare . . . .").

useful to note that Anderson's supervisor, Vela, did not ask him, much less require him, to send the letter or to file the disciplinary complaint. Anderson expressly alleged that he did so "on his own initiative." He also alleged that he asked Chief Justice Jefferson to "keep the letter confidential" so that no one "at the Thirteenth Court" would know about it. If Anderson, as Vela's briefing attorney, had an official duty to send the letter or to file the complaint, then why he would have purposely concealed his doing so from her?[81]

As the Supreme Court stated in *Connick*, "[m]atters of public concern are those which can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'"[82] "Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of . . . officials, in terms of content, clearly concerns matters of public import."[83] And, as the Supreme Court explained in *Pickering*, "statements by public officials on matters of public concern must be accorded First Amendment protection despite the fact that the statements are directed at their nominal superiors."[84]

We are convinced that Anderson sufficiently pleaded each of the elements of his retaliation claim. His speech, which was not made pursuant to his official duties as a public employee, was protected. Next, we must consider whether his right to protection for such speech was clearly established.

---

[81] As a lawyer herself, Vela was subject to the same duty to file a disciplinary complaint, yet she did not. At least circumstantially, this may suggest that she believed she had no such duty and that, in fact, no such duty existed.

[82] *Branton v. City of Dallas*, 272 F.3d 730, 739 (5th Cir. 2001) (quoting *Connick*, 461 U.S. at 146).

[83] *Conaway v. Smith*, 853 F.2d 789, 796 (10th Cir. 1988); *see Branton*, 272 F.3d at 739.

[84] *Pickering*, 391 U.S. at 574.

No. 15-40836

D.    QUALIFIED IMMUNITY DEFENSE

Valdez urges that, even if Anderson stated a retaliation claim, he (Valdez) is entitled to qualified immunity because neither *Garcetti* nor other relevant contemporary cases clearly established that speech made pursuant to a *professional* (here, ethical) duty is not speech made pursuant to an *official* duty. Anderson counters that *Garcetti* did nothing more than create a limited presumption that speech made by a public employee pursuant to an official duty is unprotected; it did not disrupt the presumption that speech made by a public employee is presumptively protected, including speech made pursuant to an ethical duty.

A person may assert a § 1983 claim against anyone who "under color of any statute, ordinance, regulation, custom, or usage, of any State" violates that person's rights under the Constitution.[85] To state such a claim, such person "must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law."[86] That said, "[t]he doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal."[87] "This immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"[88] Accordingly, we "do not deny immunity unless 'existing precedent must have placed the statutory or constitutional question *beyond*

---

[85] 42 U.S.C. § 1983.

[86] *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (quoting *James v. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008); *see Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000)).

[87] *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011).

[88] *Id.* at 371 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

*debate.'"*[89] "The basic steps of [this court's] qualified-immunity inquiry are well-known: a plaintiff seeking to defeat qualified immunity must show: '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'"[90] This court, like the district court, has "discretion to decide which of the two prongs of the qualified-immunity analysis to tackle first."[91]

"The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[92] "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."[93] "The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'"[94] "That this court has not previously considered an identical fact pattern does not mean that a litigant's rights were not clearly established."[95] But the right also should not be defined "at a high level of generality."[96] And, even in the context of

---

[89] *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)).

[90] *Id.* (quoting *Ashcroft*, 563 U.S. at 735).

[91] *Ashcroft,* 563 U.S. at 735; s*ee Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[92] *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

[93] *Id.* (citations omitted).

[94] *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).

[95] *Juarez v. Aguilar*, 666 F.3d 325, 336 (5th Cir. 2011).

[96] *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Ashcroft*, 563 U.S. at 742).

qualified immunity, "the facts alleged" must be "[t]aken in the light most favorable to the party asserting the injury."[97]

By at least 2014, it was clearly established that an employee's speech made "externally" concerning "an event that was not within [his or her] job requirements" was entitled to First Amendment protection.[98] Taking Anderson's allegations as true, as we must at this stage of the litigation, Anderson alleges exactly what *Cutler* requires. *First*, Anderson alleges that he reported his concerns about Justice Valdez externally, *viz.*, to the State Commission on Judicial Conduct.[99] *Second*, Anderson alleges that his complaint to the judicial conduct commission was outside of his job duties. Accepting Anderson's allegations as true, *Cutler* decides this appeal.

That is not to say that, by 2014, our law applying *Garcetti* spoke loudly regarding every factual circumstance. Indeed, just after Anderson spoke, the Supreme Court clarified *Garcetti* in *Lane*. In *Lane*, the plaintiff alleged that he was retaliated against for giving testimony to a federal grand jury investigating another employee.[100] The Eleventh Circuit concluded that, under

---

[97] *Tolan v. Cotton,* 134 S. Ct. 1861, 1865 (2014).

[98] *Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 472–73 (5th Cir. 2014) (finding that by 2010, the combination of *Garcetti*, *Williams*, *Davis*, and *Charles v. Grief*, 522 F.3d 508 (5th Cir. 2008), had resulted in clearly established law).

[99] Even if Anderson's complaint to Chief Justice Jefferson was arguably a complaint up the chain of command, Anderson's complaint to the State Commission on Judicial Conduct was a complaint out of the chain of command. And, Anderson alleges that it was the complaint to the State Judicial Conduct Commission that precipitated Valdez's alleged retaliation pleading: "Defendant had knowledge that Anderson filed a complaint against Defendant with the State Commission on Judicial Conduct and that Defendant interfered in Anderson's hiring because of the complaint. Specifically, on May 12, 2014, Justice Perkes told Anderson that, because Anderson had filed a complaint against Defendant with the State Commission on Judicial Conduct, Defendant told all of the Justices not to allow Anderson to work for Justice Perkes." Accordingly, Anderson alleges that he was retaliated against for complaints made outside his chain of command.

[100] 134 S. Ct. at 2375–77.

*Garcetti*, the plaintiff testified as an employee, not as a citizen, because he testified to an event that he learned on the job.[101] The Supreme Court reversed, noting that "the Eleventh Circuit read *Garcetti* far too broadly."[102] In doing so, the Court clarified that public employees' speech is not protected by the First Amendment when they speak in the course of their "ordinary" job duties.[103] Nonetheless, the Supreme Court ruled that qualified immunity was proper because the Eleventh Circuit's case law concerning whether an employee's sworn testimony was protected by the First Amendment was deeply conflicted.[104]

Thus, *Lane* plainly demonstrates that, following *Garcetti*, some First Amendment retaliation cases would still result in findings of qualified immunity. That is, *Garcetti* did not plainly establish all First Amendment retaliation law. Nonetheless, *Cutler* makes it apparent that *Garcetti*, and this court's jurisprudence interpreting it, clearly established some law. The question is how much.

Based on the allegations at issue here, *Howell v. Town of Ball* answers that question.[105] There, the plaintiff alleged that he had been fired from his job as a town police officer for cooperating with an FBI investigation into public corruption.[106] The plaintiff "emphasize[d] that, under the Supreme Court's recent decision in *Lane*, the relevant question [was] whether the speech at

---

[101] *Id.* at 2376–77.

[102] *Id.* at 2379.

[103] *Id.* at 2378.

[104] *Id.* at 2381.

[105] 827 F.3d 515 (5th Cir. 2016).

[106] *Id.* at 519.

issue [was] ordinarily within the scope of an employee's duties."[107] And, what job duties were "ordinary" was critical to the court's holding. The plaintiff "offered evidence that his involvement in the FBI investigation was outside the ordinary scope [of] his professional duties."[108] The defendants pointed to the "general" duty of all police officers to "detect and prevent crime."[109] We found that the defendants' evidence was inadequate because broad general duties "fail to describe with sufficient detail the day-to-day duties of a public employee's job."[110] That is, in assessing the summary judgment evidence presented by both sides, we concluded that, although the defendants may have asserted that the plaintiff spoke pursuant to his "general" job duties, their evidence could not demonstrate that he spoke within his "ordinary" job duties.[111]

Nonetheless, we determined that the individual defendants were entitled to qualified immunity.[112] In doing so, we noted that "the Supreme Court did not emphasize that only speech made in furtherance of an employee's 'ordinary' job duties is not protected until nearly three years after [plaintiff] was discharged."[113] In support of that proposition, we cited *Gibson*'s observation that, "although *Lane*'s insertion of the qualifier 'ordinary' did not

---

[107] *Id.* at 523.

[108] *Id.*

[109] *Id.* at 524.

[110] *Id.*

[111] *Id.*

[112] *Id.* at 525–26.

[113] *Id.* at 525.

meaningfully alter *Garcetti*'s original test, it does provide additional guidance regarding what speech falls within an employee's official duties."[114]

Reading *Howell* in the framework of *Cutler* properly synthesizes *Lane*'s effect on *Garcetti*. Namely, *Garcetti* and our court's pre-*Lane* jurisprudence established that when employees speak outside of their chain of command and outside of their job duties they are entitled to First Amendment protection.[115] *Lane* and *Howell*, however, indicate that some cases are too difficult to be determined pursuant to that rule. Even though in some cases employees might have a general employment duty to speak, that duty is not part of their "ordinary" official duties, so their speech pursuant to that general duty is protected by the First Amendment.

Equally clear, however, is that neither *Lane* nor *Howell* meaningfully altered the analysis required by *Garcetti* and *Cutler* when an employee's allegations do not concern the distinction between "ordinary" and "non-ordinary" job duties.[116]

Here, there is not—and at the motion to dismiss stage there can never be—a meaningful factual dispute that implicates *Lane*'s ordinariness rule.[117] Anderson alleges that his speech to the State Commission on Judicial Conduct

---

[114] *Id.* (citing *Gibson*, 773 F.3d at 668).

[115] *See Cutler*, 767 F.3d at 472–73.

[116] *See Gibson*, 773 F.3d at 668–69; *see also Hardesty v. Cochran*, 621 F. App'x 771, 780–81 (5th Cir. 2015) (unpublished) ("The Supreme Court's recent decision in Lane . . . did not alter First Amendment jurisprudence in any way that would render the currently applicable law not clearly established under these facts." (internal citation omitted)).

[117] In addition to the ordinariness rule, *Lane* found that qualified immunity was proper because of conflicted eleventh circuit case law concerning First Amendment protection for sworn testimony. *Cutler* resolves the need to engage in such an inquiry here because *Cutler* found that by 2010 this circuit case law had clearly established the contours of the First Amendment protections provided by *Garcetti*, at least with respect to the violations that Anderson alleges.

was made outside of his chain of command and outside of his job duties. Perhaps at the summary judgment or trial phase facts will come to light that implicate *Lane*. Until then, however, the ordinariness rule simply does not implicate the right at issue here.

Accordingly, under *Cutler*, Anderson has pleaded the violation of a clearly established right. Qualified immunity thus does not apply—at least, not yet.

### III.

### CONCLUSION

For the forgoing reasons, we AFFIRM the holding of the district court and REMAND for further proceedings on Anderson's claim against Valdez in his individual and official capacities.

JONES, Circuit Judge, dissenting:

I agree with the majority that even after *Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951 (2006)*,* Anderson has plausibly alleged a violation of his First Amendment rights. Unfortunately, that is the end of our agreement, because I disagree with the majority's reasoning to this conclusion and would grant qualified immunity.

**A. First Amendment Retaliation**

In the course of discussing Anderson's First Amendment retaliation claim, the majority has made two errors. The first error constitutes dicta that need not be followed hereafter: the majority irrelevantly invoke the Restatement of Agency and state law of agency to "explain" the scope of a public employee's official duties. The second error is in the implication that any "whistleblower" speech by a public employee, even when made pursuant to his official duties, takes the employee's retaliation claim out of *Garcetti*'s threshold inquiry. After explaining these mistakes, I write why, under a proper *Garcetti* analysis, Anderson has stated a claim for relief.

One paragraph of the majority opinion begins by stating, "In some circumstances, state law is relevant insofar as it describes the plaintiff's position, including his duties and the way he is hired, supervised, and fired." (The majority reinforce this idea in a lengthy footnote citing agency and contract law hornbooks.) *Garcetti*, to the contrary, describes the inquiry defining the scope of an employee's duties as "a practical one," such that formal job descriptions will not suffice to insulate employers. 547 U.S. at 424–25, 126 S. Ct. at 1961–62. It stands to reason that reference to treatises untethered to a particular public employee's workplace will also yield little insight. In any event, the majority cites these references but does absolutely nothing with them in further analysis of Anderson's duties. These are dicta, pure and simple.

Much more helpful than treatises in illuminating the practical scope of *Garcetti* are our court's decisions that evaluated whether employees' official duties comprehended the speech for which they claimed First Amendment protection. Thus, in *Williams v. Dallas Independent School District*, 480 F.3d 689 (5th Cir. 2007), this court concluded that a high school athletic director's communications to the principal expressing concern about the use of funds appropriated for athletic activities were made "in the course of performing" his job duties sufficiently to preclude First Amendment protection. *See id.* at 693–94. In *Davis v. McKinney*, 518 F.3d 304 (5th Cir. 2008), the question was whether any of several complaints made by a former auditor of a state university "up the chain of command" and to the FBI and EEOC about internal audit problems, staffing issues and potential racial discrimination were "in the course of performing" the auditor's job duties. *See id.* at 312–16. The focus was on the relation between the job duties and the speech, not on whether (as the majority states here) "the employer had an interest in controlling" the speech, or on an auditor's professional ethics, or alleged whistleblower status. *Davis* ultimately found some of the communications protected by the First Amendment, while others were not. *Id.* at 315–16. *See also Nixon v. City of Hous.,* 511 F.3d 494, 498 (5th Cir. 2007) (holding that a police officer's volunteered media statement critical of the Houston Police Department's high-speed chase policy nevertheless was made "pursuant to his official duties and during the course of performing his job.")

The majority's second implication, that any "whistleblower"-type speech is constitutionally protected, is not benign. The majority asserts that an employee "is not speaking pursuant to his official duties" and therefore gains First Amendment protection *whenever* he exposes unlawful, inappropriate or inefficient government conduct. Purporting to draw support from *Garcetti* for

this point, the majority refer to the Supreme Court's penultimate paragraphs, which begin by stating, "Exposing governmental inefficiency and misconduct is a matter of considerable significance." 547 U.S. at 425, 126 S. Ct. at 1962. The majority misconstrue the Court's discussion—which merely enumerates various limitations on public officials and concomitant protections of public employees—as an invitation to lower courts to distinguish "lawful and appropriate" employer control of the employee's speech from that which is "unlawful and inappropriate." This is not what the Court says. The Court finishes its discourse by *rejecting* "the notion that the First Amendment shields from discipline the expressions employees make pursuant to their professional duties. Our precedents *do not support* the existence of a constitutional cause of action behind every statement a public employee makes in the course of doing his or her job." *Id.* (emphasis added).

The majority's gratuitous focus on (a) the nature of the speech and (b) the government employer's "interest in control" muddle *Garcetti*'s clear threshold line that holds speech undertaken pursuant to an employee's job duties is categorically unprotected by the First Amendment. The majority assert generally that it "was lawful and appropriate" for the District Attorney's office in *Garcetti* to "control" attorney Ceballos's speech pursuant to his official duties, but this is semantics. Ceballos was reporting about police misconduct, specifically, misrepresentations made in a warrant affidavit; his opinion was overruled by his superiors who continued the criminal prosecution. The Supreme Court explicitly did not rule on the merits of Ceballos's internal memos and held simply that because they were authored pursuant to his official duties, they receive no First Amendment protection. Yet, under the majority's misplaced analysis, Ceballos's memos might just as easily be characterized as those of a "whistleblower" exposing both police and

34

prosecutorial misconduct.  The majority, therefore, have smuggled back into *Garcetti*'s threshold issue of job duties an evaluation of the speech itself based on the employer's "interest in controlling" the employee speech, or whistleblower revelations.

Despite my disagreement with the majority's reasoning, I concur that Anderson stated a claim for First Amendment retaliation.  The fact that his boss, Justice Vela, conveyed the incriminating information to Anderson means that the speech "related" to his job duties, but Anderson pleads that he did not write the letters under her supervision or on her orders or even with her knowledge.[1]  *Cf. Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014) (First Amendment retaliation claim could proceed under *Garcetti* where employee's testimony in criminal court related to and "concern[ed] information learned in the course of" his employment duties, but the speech *itself*, rather than falling within those duties, was an obligation of every citizen).  A careful analysis of Anderson's job duties indicates that his complaints about Chief Justice Valdez were not made "pursuant to his duties" or "in the course of performing" his work as a briefing attorney to Justice Vela.

A judge's briefing attorney is paid by the court but is normally accountable to the judge (or judges) for whom he directly works.  The relation between a judge and a law clerk is both sensitive and confidential.  Further, the scope of the clerk's duties for "his" judge varies widely within the judiciary, in part because a judge takes advantage of each briefing attorney's particular experience and expertise.  It is hardly unusual for a briefing clerk's duties to

---

[1]  Contrary to what both Chief Justice Valdez and the majority assert, Anderson's professional duties as an attorney neither add to nor detract from this analysis.  Arguably such considerations might be relevant under the *Pickering* balance, but Chief Justice Valdez did not challenge the district court's application of the *Pickering* balance and thus we have no occasion or need to address that waived argument.

35

range beyond writing legal memoranda, conducting research on pending cases, and advising on motions before the court. Anderson accordingly became responsible for advising Justice Vela when she inquired of him about the legality of the chief justice's travel reimbursements. Based on their confidential relationship, Anderson would also have had the duty to inform Justice Vela if he had independently discovered possible malfeasance within the judiciary. Justice Vela in either case shouldered a duty to pursue the allegations, but Anderson's official work ended with rendering his confidential advice to Justice Vela; the justice asked no more of him. Reporting "up the chain" to Chief Justice Jefferson and the State Commission on Judicial Conduct fell outside Anderson's employment duties.[2]

For these reasons, it is consistent with *Garcetti*, *Williams*, and *Davis* to conclude that, under the facts pled, Anderson was not employed to investigate and report judicial malfeasance beyond his response to Justice Vela's inquiry. Further, his complaints "up the chain" reflect protected speech as a citizen on a matter of public concern.

### B. Qualified Immunity

On the question of qualified immunity, the majority are rightly concerned that a judicial officer should not be able to shield himself from the

---

[2] *Garcetti* does not accord any special First Amendment shield to publicly employed professionals by virtue of their ethical codes. Nor, as Chief Justice Valdez suggests, are ethical codes a *Garcetti*-fashioned sword. He argues that Anderson is a licensed Texas attorney bound by the Texas Disciplinary Rules of Professional Conduct. *See* Tex. Loc. Gov't Code § 81.072(d); *In re Meador*, 968 S.W.2d 346, 350 (Tex. 1998). Chief Justice Valdez contends that it is at least arguable that following the Disciplinary Rules is part of a briefing clerk's official duties. If Anderson was obliged by the Rules, and thus his employment duties, to report on alleged misconduct, then his speech was not entitled to constitutional protection.

The district court aptly summarized its rejection of this argument: "In no way does *Garcetti* permit an employer to take refuge under the broad net of its employees' professional ethical obligations that happen to implicate speech on matters of public concern, and that apply to all members of the profession regardless of whether they are publicly employed."

consequences of actionable retaliation if the law clearly held that a law clerk was speaking "as a citizen" when he reported the alleged judicial misconduct to the chief justice of the Texas Supreme Court and the State Commission on Judicial Conduct.  But in this case, as in all qualified immunity cases, the law must have been "clearly established" at the time of the official's conduct under factually analogous circumstances.  *See Brosseau v. Haugen*, 543 U.S. 194, 198–201, 125 S. Ct. 596, 599–600 (2004) (per curiam).   Only the "plainly incompetent" public officials or those who "knowingly violate the law" are denied the protection of qualified immunity.  *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 3038 (1987) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096 (1986)).

The majority correctly note that post-*Garcetti* and before Chief Justice Valdez acted against Anderson, our court's decisions distinguished between a public employee's speech within the chain of command of his office (speech that is constitutionally unprotected) and speech "as a citizen," which is directed outside to third-party responders like the EEOC (and may be constitutionally protected).  *See, e.g.*, *Davis*, 518 F.3d at 315–16 (holding some complaints within the UT System to be unprotected while those to the EEOC were accorded constitutional protection).[3]   Based on my view that Anderson's employment was centered on his duty to "his" judge, Anderson necessarily

---

[3] I assume *arguendo*, as the Supreme Court has assumed *arguendo*, that a right may be clearly established by circuit precedent alone even though Supreme Court precedent has not clearly established the right. *See Taylor v. Barkes*, 135 S. Ct. 2042, 2044–45 (2015) (per curiam) (twice noting that "[n]o decision of this Court" was similar to *Taylor* before "[a]ssuming for the sake of argument that a right can be 'clearly established' by circuit precedent despite disagreement in the courts of appeals"); *Reichle v. Howards*, 132 S. Ct. 2088, 2093–94 (2012) (noting "[t]his Court has never held that there is such a right ['to be free from a retaliatory arrest that is otherwise supported by probable cause']" before "[a]ssuming arguendo that controlling Court of Appeals' authority could be a dispositive source of clearly established law").

went outside his "chain of command" when he reported about Chief Justice Valdez on his own to the State Commission on Judicial Conduct.   This logic suggests an argument for denying qualified immunity.

Nevertheless, the issue is more complex than the majority's analysis acknowledges because, under the Texas Constitution, the Commission includes members of the public,[4] but its proposed sanctions against a judge are ultimately reviewable by the Texas Supreme Court.[5]  The Texas judiciary may thus be considered its own self-regulator.   In this situation, Chief Justice Valdez's argument is far from frivolous that Anderson's complaint went up the "chain of command" within the judiciary.     Consequently, the ultimate constitutional status of Anderson's speech, and thus his right to a First Amendment shield against employment consequences, are debatable. Debatable constitutional violations demand qualified immunity for public officials, even when this court is bound to conclude that a violation in fact occurred.   *See, e.g.*, *Morgan v. Swanson*, 659 F.3d 359, 389–90 (5th Cir. 2011) (en banc) (holding "[t]he defendants in this case are entitled to qualified immunity because existing precedent failed to place the constitutionality of their conduct 'beyond debate'"); *Noyola v. Tex. Dep't of Human Res.*, 846 F.2d 1021, 1026 (5th Cir. 1988) (granting qualified immunity because "neither the 'contours' of Noyola's rights were so clearly outlined nor was the 'unlawfulness' of terminating Noyola so 'apparent' that Appellants should

---

[4] *See* Tex. Const. art. V, § 1-a(2) (stating that the thirteen-member Commission shall be comprised of: one court of appeals justice; one district judge; two members of the state bar who have practiced law for ten consecutive years; five citizens who are not licensed to practice law not public employees; one justice of the peace; one municipal court judge; one county court at law judge; and one constitutional county court judge).

[5] *See id.* art. V, § 1-a(9) ("A Justice, Judge, Master, or Magistrate may appeal a decision of the review tribunal ['order[ing] public censure, retirement or removal'] to the Supreme Court under the substantial evidence rule.").

forfeit their qualified immunity" (quoting *Anderson*, 483 U.S. at 640, 107 S. Ct. at 3039)).

For these reasons, even if Anderson's allegations are proven to be true, I conclude that Chief Justice Valdez visited unconstitutional retaliation upon Anderson but the law was not "clearly established" such that any "reasonable [judicial] official would understand" that Anderson's speech was constitutionally protected because it occurred outside the law clerk's "chain of command." *See Anderson*, 483 U.S. at 640, 107 S. Ct. at 3039.

I respectfully dissent.