## THE EMMA B.

### (District Court, D. New Jersey. February 17, 1908.)

1. MARITIME LIENS—STATUTORY LIENS—ENFORCEMENT IN ADMIRALTY.

Persons furnishing supplies to a domestic vessel, for which they are given liens by a state statute, are entitled to enforce them in a court of admiralty against the proceeds of the vessel, when sold in a suit for partition between the owners.

[Ed. Note.—Maritime liens created by state laws, see note to The Electron. 21 C. C. A. 21.]

2. SAME—SUPPLIES—EQUIPMENT OF FISHING VESSELS.

Hooks, lines, bait, ice, and covers required to protect boats from the weather, while on board, are a necessary part of the equipment of a vessel engaged in fishing, and persons furnishing the same to the vessel in a foreign port on order of her master are entitled to maritime liens therefor.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Maritime Liens, § 14.]

3. SAME—ADVANCES MADE IN FOREIGN PORT.

A company engaged in handling fish on commission, which made advances from time to time between trips to the master and managing owner of a fishing schooner, registered in a neighboring port in another state, to enable him to carry on the business, selling the catches made and crediting the proceeds thereon, which advances were made without inquiring as to the credit or standing of the owners, and were not shown to have been needed or used for the necessary equipment of the vessel, is not entitled to a maritime lien for a balance due thereon.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Maritime Liens, § 18.]

4. SAME—REPAIRS—ALTERATIONS IN VESSEL.

Alterations made in a vessel to better fit her for a particular kind of business, but which do not essentially change her character, do not constitute construction, but repairs.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Maritime Liens, §§ 14, 15.]

5. SAME—PRESUMPTION OF LIEN.

Where repairs are ordered by the master and managing owner of a vessel in a foreign port, a lien is presumed against the vessel unless the contrary is shown.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Maritime Liens, §§ 14, 15.]

In Admiralty.
See 140 Fed. 771,

Linsly Rowe, for libelants and certain intervening petitioners.
James Parker, for petitioners.
Cushman & Dewell, for Henry F. Pierce.

CROSS, District Judge. This action was instituted originally by libel filed by Henry F. Pierce, a half owner, against the schooner Emma B and Harry Maddox, the other half owner, for a licitation and an accounting. Subsequently under these proceedings the schooner was sold by the marshal of this district and the proceeds of sale paid into the registry of the court. Prior to the sale, however, A. C. Brown & Sons filed a libel against her for repairs. All of the other demands were presented to the court by certain petitioners, who claim liens

against the proceeds of sale. The schooner was registered at Perth Amboy, N. J., and, as already stated, was owned in equal shares by Pierce and Maddox, both of whom were residents of New Jersey. Differences arose between the owners of the schooner as to her management, which caused the filing of the libel in licitation. At the time the several claims presented for adjudication arose, Maddox had charge of the schooner as captain and managing owner, and used her in summer in taking out excursion parties for the day from Asbury Park, N. J., and in winter for cod and mackerel fishing. The amounts of the several claims are undisputed. The contest is limited as to whether or not they are liens against the boat or the proceeds of sale, as the case may be. The claims of Charles O. Munson and George B. Evans are claimed to be liens under a statute of New Jersey. All of the others are claimed to be liens under the general maritime law. The statute referred to is as follows:

"Whenever a debt shall be contracted by the master, owner, agent or consignee of any ship or vessel within this state for either of the following purposes: On account of any work done, or materials or articles furnished for equipping such ship or vessel; for such supplies, provisions and stores furnished within this state for the use of such ship or vessel at the time when the same were furnished * * *—such debt shall be a lien upon such ship or vessel, her tackle, apparel and furniture, and continue to be a lien on the same until paid, and shall be preferred to all other liens thereon, except mariners' wages."

The claim of Evans is for supplies furnished to the schooner on December 18, 1905, and amounts to $35.22. That of Munson is for work and services and supplies furnished the schooner, to the amount of $174.39. There is no evidence which shows that these claims are not just, or that the various items were not furnished for the purposes set out in the respective petitions. Pierce, one of the half owners, denies that they are liens against the boat, and in support of his contention claims that he gave notice to the petitioners, before the claims were contracted, that they must not run any bills against the Emma B. The notice, if it had any value, was given, however, after the bills were contracted. The petitioners have liens under the statute, and are entitled to maintain them against the proceeds of sale. The Vigilant, 151 Fed. 747, 81 C. C. A. 371; The Iris, 100 Fed. 104, 40 C. C. A. 301; The Rockaway (D. C.) 156 Fed. 692.

The remaining claims will be considered separately, as the facts in respect to them are somewhat variant. That of Augur is for $26.89, for fishing supplies furnished to the vessel in New York upon the order of Maddox, her master and managing owner. The account was charged against the Emma B, and Maddox told the petitioner upon several occasions that the schooner was responsible for it. I think the claim is a valid lien.

The claim of Herman F. Wilckens is for supplies furnished the boat at his place of business in New York City, and the balance due thereon is $238.64. This bill was also ordered by Maddox, who told him that the schooner was responsible for her supplies. No evidence is shown in opposition to this claim. The supplies were ordered by the managing owner on the credit of the boat.

The petition of Winfield S. Pendleton & Co., is for $146.01 for hooks, lines, fishing tackle, and supplies which were furnished the schooner in the city of New York upon the order of Maddox. He was known as the captain, but not as a part owner. The boat, as we have seen, was used in the winter for fishing purposes, and the supplies furnished were a necessary part of her equipment for such use. The petitioners have a maritime lien.

The claim of John J. Burchell is for a cover for a nest of dories carried upon the schooner on her fishing trips. It was made of cotton canvas, and was necessary to protect the boats from the weather and prevent their freezing together. The boats were a necessary part of the fishing equipment. He dealt with Capt. Maddox, without knowledge that he was the owner. The amount of this claim is $15, and his right to a lien is unquestionable.

The next claim for consideration is that of Wilson & Barry, Incorporated. This is mainly for advances made in New York at the instance of Capt. Maddox. The business of the petitioner may be summarized as follows: It dealt with fishermen, who sent it fish on consignment, bought and sold fish, and "handled" fish for smacks. It also financed the vessels, and in further explanation thereof its assistant treasurer, the only witness produced in its behalf, in answer to the question, "What do you do in that line?" said:

"Well, a captain wishing to go out fishing and hasn't the money, why we advance the money for him, and then as he makes the trips, if it is profitable, why he reduces the liability."

And again the same witness says that the company advanced funds to the captains of fishing vessels, sold their catches, and credited the amount of the catches on account of the moneys advanced, although he also said that the moneys in question were advanced to the Emma B for the running of the boat, wages, bait, ice, and such other expenses as might arise; but there is no evidence that they were required or used for such purposes. On the contrary, it appears that the ice and bait bills were not included in the money advancements. The total amount advanced was $2,351.47, and credits appear to the amount of $1,566.94, leaving a balance of $784.53, which is the amount claimed. The dealings were had with Maddox. When complaint was made to Capt. Maddox, after five or six advances had been made, that the trips were not bringing in as much money as he had drawn for the running of the smack, he answered, according to the witness, "to the effect that the smack was worth a great deal more than I am getting, and you need not worry." The advances were made during the months of December, 1905, and January and February, 1906. About $150 of the total amount was applied specifically to the payment of bills for bait and ice. These items, I think, may properly be considered as necessary supplies for the boat in connection with the business in which she was engaged. Such items, however, are more than covered by the admitted credits, and therefore need not be further considered.

All of the other advances were in cash, and with one exception ranged in amount from $250 to $300. The excepted item was for $50. The several credits evidently represented the value of the successive

catches of fish, since each is entered, after giving its date, as "trip," and then follows the amount of the credit. The petitioner knew that the boat was from New Jersey, but did not, so far as appears, know her place of registry. The advances were not, in my opinion, of a character to give a maritime lien. They were rather in the nature of general loans made upon the personal credit of the owner, or upon the security of the fish, and not for the purpose of enabling the boat to complete a voyage, or for repairs, supplies, or other items of necessity. These loans, repeated almost weekly, were apparently made without any regard to the needs of the vessel. They were advances of capital to enable the owner to carry on his business. No attempt was made to find out the needs of the boat, her place of registry, who her owners were, or their credit and financial standing. Perth Amboy may be reached by rail from New York in a little over an hour, and even if the officers of the petitioner did not know that Perth Amboy was the boat's port of registry, they did know she was from New Jersey, and there are so few ports there that within a day or two at the most, upon proper inquiry, they could have put themselves in possession of the facts. Advances which constitute a maritime lien must be made for necessaries. These were not made for any such purpose. This appears clearly, not only from the general business of the petitioners, but also from the character of the successive transactions. The petitioners were financing a private business, and not making advances for the necessities of a vessel, within the meaning of admiralty law. The advances were not made to complete an enterprise, or even for the undertaking of a single enterprise, but for many—indeed, for a whole season's business. As already stated, the security for the advances, it is apparent, was the value of the catches of fish, or the credit of the boat owner, and not the vessel. Furthermore, there is no evidence whatever that the owners were impecunious and without credit. Upon all material matters the petitioners appear to have willfully shut their eyes and acted blindly. Such a course was unjustifiable. In The J. B. Williams (C. C.) 42 Fed. 533, 542, the court said:

"A party lending to a master in a foreign port cannot shut his eyes to existing facts as they appear, or by reasonable inquiry could be made to appear, and deal with the master as a general agent of the vessel and owners, whose representations he may trust and act upon, without any diligence or inquiry on his part as to the extent of and character of the vessel's needs and necessities. Necessity creates the agency, and confers the authority on the master to borrow or secure loans on the credit of the vessel, and that necessity equally defines the limits to which he may rightfully go, and the lender treating with him must make inquiry and judge for himself, and at his own risk, whether the desired advance is a matter of such necessity as to bring it within the master's agency and authority. The cases on this subject, which it is not deemed necessary to review, do not, in my opinion, establish the proposition, contended for by counsel for libelants and announced in the opinion of the district judge, that a lender in a foreign port can act alone upon the master's representation as to the purpose for which the loan is wanted, and, if such expressed purpose is maritime in its character, thereby acquire a maritime lien on the vessel for the full amount of the advances made. When funds are advanced to the master to discharge valid existing maritime liens, and are so used, the lender may properly and equitably stand in the place of the lien holders, whose demands have been discharged with funds furnished by him. It seems to me that the weight of reason and authority supports this

position, especially in the case of a lender who makes no inquiry, but shuts his eyes as to the necessary wants of the vessel."

The burden of proof to show that advances were for necessaries rested upon the petitioner. Bush & Sons v. Fitzpatrick et al. (D. C.) 73 Fed. 501. One who loans money to the master or owner of a vessel who is without funds in a foreign port, to be used in furnishing materials, repairs, or supplies to the vessel, and which is actually used for that purpose, is entitled to a maritime lien on the vessel therefor, and when moneys are advanced in a foreign port to pay maritime liens, and are so used, the lender is subrogated to the rights of the lienors. The City of Camden (D. C.) 147 Fed. 847, and cases cited. See, also, The Alcalde (D. C.) 132 Fed. 576. There is no evidence in this case which shows that the moneys advanced were actually used for necessaries or in the payment of maritime liens, but rather the contrary is shown. The claim of this petitioner against the proceeds of the boat is therefore disallowed.

The only remaining claim is that of the firm of A. C. Brown & Co., who are shipbuilders and have their dock and shipyards at Tottenville, Staten Island, N. Y. The bill of $714.58, for which they filed a libel against the Emma B before she was sold, is for repairs and alterations made to her in the latter part of the year 1904, and extending into the year 1905. The work was ordered by Maddox, the captain and managing owner of the vessel. The boat was originally built for taking out summer excursion parties and for winter fishing, and was used by both owners at different times for those purposes. Such changes as were made by the Browns did not essentially alter her character, although they probably did make her more fit for fishing than for excursion purposes. That such changes, however, do not constitute construction, but repairs, was held by the Circuit Court of Appeals for the First Circuit in The Iris, ubi supra, where the headnote, which is supported by the text, says:

"Work done and materials furnished in fitting a steamer which is then a seagoing vessel for a different trade from that for which she was originally designed are to be taken as having been furnished for repairs, and not for construction, although the expenditures therefor are large as compared with the value of the vessel."

Where repairs are ordered by a captain and managing owner in a foreign port, a lien is presumed against the vessel, unless the contrary is shown. The rule so often stated was well summarized by Judge Gray in The Vigilant, 151 Fed., at page 748, 81 C. C. A., at page 372, where he says:

"The debt due upon a contract, for supplies furnished or repairs done to a foreign vessel, made by the master, agent, or managing owner of said vessel, is, unless the contrary is shown, presumed to have been incurred on the credit of the vessel, and for the security of the debt the general maritime law creates a lien. The reason, as so often stated, for the implication made by the maritime law, that necessaries furnished to a vessel in a foreign port are furnished on the credit of the vessel, is that the exigencies of commerce require that a ship 'should go,' and not be delayed or hindered by the difficulties of ascertaining or making available the credit and responsibility of the owner. In such cases, therefore, the authority of the master, managing owner, or other agent to pledge the ship for debts so incurred is presumed."

Capt. Pierce, one of the owners, testifies that he visited the docks of the libelants during the pendency of the work and ordered them not to make the repairs on the credit of the vessel, although at another place in his testimony he swears that he did not know the work was being done until it was about completed. The libelants, however, say that he notified them merely that he would not be responsible outside of or beyond his interest in the boat, and this statement appears repeatedly. The burden of proof rested upon Pierce to relieve the boat from the presumption of liability to lien, which under the circumstances rested upon her, and the burden has not been sustained. The libelants are entitled to the amount of their claim, with interest.

Upon the whole case then, the claims of Abram C. Brown & Co., and of all the intervening petitioners, except that of Wilson & Barry, Incorporated, are allowed, with interest and costs. In the excepted case, that of Wilson & Barry, the petition will be dismissed, with costs. Separate decrees will be entered in accordance with the above conclusions.