# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-10467

United States Court of Appeals
Fifth Circuit

**FILED**

July 11, 2018

Lyle W. Cayce
Clerk

ISRAEL ESCOBAR,

> Plaintiff–Appellee
> Cross−Appellant,

versus

LANCE MONTEE,

> Defendant–Appellant
> Cross–Appellee.

Appeals from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, SMITH, and CLEMENT, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

Israel Escobar assaulted his wife and fled from the police with a knife. While chasing him, the police were informed—by Escobar's mother—that they would have to kill him to get him. The police eventually found Escobar in a backyard and released a dog to capture and hold him. Escobar was bitten by the dog until fully handcuffed by the police, even though he avers that he dropped the knife and lay flat on the ground once discovered. Because he

No. 17-10467

claims he was trying to surrender, Escobar contends that both the initial bite and the continued biting were excessive force in violation of the Fourth Amendment. He brought those claims, among others, under 42 U.S.C. § 1983. The district court dismissed the initial-bite claim on a Federal Rule of Civil Procedure 12(b)(6) motion, then denied Officer Lance Montee summary judgment on a claim of qualified immunity ("QI"). Montee appeals the denial of QI; Escobar cross-appeals the dismissal of his initial-bite claim. Finding no Fourth Amendment violation, we reverse the denial of qualified immunity, dismiss the cross-appeal for lack of jurisdiction, and remand.

## I.

Escobar assaulted his wife in a restaurant parking lot, and then left her alone in a nearby retail lot. After noticing police vehicles at his house, he fled into the night. He ran through several neighbors' yards, finally hiding in the backyard of a house a few blocks from his own. He remained there, crouched under an awning near the backdoor, for about twenty minutes while the police searched for him, both on foot and in a helicopter. They eventually located Escobar, and the helicopter circled the house while the police decided on a course of action.

While the helicopter monitored Escobar, the police were informed that he had a knife. Furthermore, they were told that Escobar's mother had called and said the police would have to kill Escobar to catch him; he would not go without a fight. Based on those facts, Montee—the K-9 officer in charge of the police dog "Bullet"—decided not to give his usual warning to the suspect that he would deploy the canine. Instead, he threw Bullet over the fence surrounding the backyard and only then scaled the fence himself.

Montee followed Bullet alongside the house into the backyard, where he claims he saw Escobar standing with the knife. Escobar disagrees; according

2

to him, once he heard the dog and officers approaching, he dropped his knife and lay flat on the ground "like a parachute man." Either way, Escobar was then bitten by Bullet and wound up lying flat on the ground. Montee agrees that Escobar then dropped the knife but maintains that the knife remained within Escobar's reach—a fact Escobar never disputes.

Escobar claims he remained on the ground in an attempt to convey his surrender. But Montee, believing Escobar still posed a threat because of the knife and warnings by Escobar's mother, allowed Bullet to continue biting Escobar until Escobar was fully subdued and in handcuffs. All in all, Escobar was bitten for approximately one minute. Once he was cuffed, the officers removed Bullet and took Escobar away; he eventually pleaded guilty of third-degree family assault.

Escobar sued Montee under § 1983, alleging that Montee violated his Fourth Amendment right to be free from excessive force by (1) having Bullet initially bite him without warning and (2) permitting Bullet to continue biting after he surrendered and was not resisting. Montee, claiming QI, moved to dismiss under Rule 12(b)(6).

The district court granted Montee's motion as to Escobar's first claim, i.e., as to the initial bite. As the court reasoned, Montee's initial decision to release Bullet without warning was objectively reasonable because a reasonable officer in Montee's shoes would not have known Escobar was surrendering. The court denied the motion as to Escobar's second claim, i.e., as to the continued biting.

Montee moved for summary judgment; he and Escobar submitted dueling affidavits that provide the factual background above. The district court denied Montee's motion, reasoning that—with the facts construed in Escobar's favor—a reasonable officer would have known that Escobar was not resisting

No. 17-10467

and was surrendering. And the court found that such force, in the face of surrender, is clearly established as violating the Fourth Amendment.

Montee appealed, claiming QI. Escobar cross-appealed the Rule 12(b)(6) dismissal of his initial-bite claim, contending we have pendent appellate jurisdiction over that dismissal.

## II.

We start by assessing our jurisdiction.[1] Montee's appeal is based on QI and thus, although this is an interlocutory appeal, the order denying QI is appealable. *Mitchell v. Forsyth*, 472 U.S. 511, 524–30 (1985). Beyond the limited right to an interlocutory appeal, the ability to enjoy pendent appellate jurisdiction is carefully circumscribed. The Supreme Court has recognized two exceptions to the bar on court-created interlocutory appeals: (1) If the pendent decision is "inextricably intertwined" with the decision over which the appellate court otherwise has jurisdiction, pendent appellate jurisdiction may lie, or (2) if "review of the former decision [is] necessary to ensure meaningful review of the latter." *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 51 (1995).[2] Such exceptions are proper because courts should "extend their *Cohen* jurisdiction[3] to rulings that would not otherwise qualify for expedited consideration" "[o]nly

---

[1] "[E]very federal appellate court has a special obligation to 'satisfy itself . . . of its own jurisdiction' . . . even though the parties are prepared to concede it." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (quoting *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934)).

[2] Thus, in *Clinton v. Jones*, 520 U.S. 681, 707 n.41, (1997), the Court found that pendent appellate jurisdiction was proper over an equitable stay of trial proceedings against the President where it otherwise had jurisdiction over the President's claim of immunity from trial proceedings. The issue of Presidential immunity was "inextricably intertwined" with the equitable grant of a stay; indeed, "review of the latter decision is necessary to ensure meaningful review of the former." *Id.* (omitting brackets). And as the court of appeals had noted, the issues of immunity and equitable stay turned on one question: the degree to which a President should be immune from suit. *See id.* at 707 & n.41; *Jones v. Clinton*, 72 F.3d 1354, 1357 n.4 (8th Cir. 1996).

[3] *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949).

where [those rulings are essential] to the resolution of properly appealed collateral orders." *Id.* (quoting Riyaz A. Kanji, *The Proper Scope of Pendent Appellate Jurisdiction in the Collateral Order Context*, 100 YALE L.J. 511, 530 (1990)).

Pendent appellate jurisdiction "is only proper in [the] rare and unique circumstances" articulated by *Swint*.[4] Escobar believes he has such a "rare" and "unique" case, reasoning that his claim based on the first bite is "inextricably intertwined" with the claim for continuing bites. But the claims are obviously severable. The district court considered and decided them separately, finding for Montee on one claim and for Escobar on the other. And the court issued individualized orders on each claim at distinct stages of the proceedings. Plainly the decision to dismiss the first-bite claim was not "inextricably intertwined" with whether summary judgment was proper on the continued-bite claim.

A survey of our caselaw exposes the flaws in Escobar's position. To support pendent appellate jurisdiction, Escobar cites *Anderson v. Valdez*, 845 F.3d 580 (5th Cir. 2016), where, as here, the court had interlocutory appellate jurisdiction over the appeal of a QI-based motion to dismiss. *Id.* at 588–89. The court exercised pendent appellate jurisdiction only over an additional appeal of whether the plaintiff had even stated a claim. *Id.* The question whether a plaintiff has alleged a constitutional violation can be seen as inextricably intertwined with whether an officer has QI. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). Read properly, *Anderson* does not support Escobar's position.

Pendent appellate jurisdiction may be proper where (1) the court will decide some issue in the properly brought interlocutory appeal that necessarily

---

[4] *Byrum v. Landreth*, 566 F.3d 442, 449 (5th Cir. 2009) (quoting *Thornton v. Gen. Motors Corp.*, 136 F.3d 450, 453 (5th Cir. 1998) (per curiam)).

disposes of the pendent claim;[5] (2) addressing the pendent claim will further the purpose of officer-immunities by helping the officer avoid trial;[6] (3) the pendent claim would be otherwise unreviewable;[7] or (4) the claims involve precisely the same facts and elements.[8]  Escobar's cross-appeal does not fit any of those categories.  Deciding Montee's appeal will not necessarily dispose of Escobar's cross-appeal, as evidenced by the disposition in the district court.  Nor would addressing Escobar's first-bite claim further the purposes of QI by helping Montee avoid trial.  And Escobar's claim is reviewable through the normal course of appellate review.

Finally, as explained above, the first-bite claim and continued-bite claim do not involve precisely the same facts in such a way as to be "inextricably intertwined."  Indeed, the claims "were treated separately by the district

---

[5] *Compare Anderson*, 845 F.3d at 588–89; *Comstock Oil & Gas, Inc. v. Ala. & Coushatta Indian Tribes of Tex.*, 261 F.3d 567, 570–71 (5th Cir. 2001) (exercising pendent appellate jurisdiction over the question of a trial council's *members'* immunity from suit where the appeal turned on the tribal *council's* immunity from suit and both immunities turned on the nature of the relief sought); *and Thornton*, 136 F.3d at 453–54 (exercising pendent appellate jurisdiction over a non-final attorney's fee sanction because that sanction was inextricably intertwined, and based on the same conduct, on a properly appealed, final suspension sanction); *with Byrum*, 566 F.3d at 450–51 (declining to exercise pendent appellate jurisdiction over a summary judgment motion even though it had jurisdiction over the denial of a preliminary injunction because it was possible to rule on the latter without disposing of the former).

[6] *Compare Morin v. Caire*, 77 F.3d 116, 119–20 (5th Cir. 1996) (permitting pendent appellate jurisdiction over state tort claims against an officer who was also appealing the denial of QI as to constitutional claims because refusing to do so would defeat the purpose of interlocutory review of QI, *i.e.*, "allowing an appeal of immunity issues before a government employee is forced to go to trial") *with Gros v. City of Grand Prairie*, 209 F.3d 431, 436–37 (5th Cir. 2000) (declining pendent appellate jurisdiction in part because doing so would not force the officer to go to trial).

[7] *See Gates v. Cook*, 234 F.3d 221, 227–228 & n.5, 6 (5th Cir. 2000) (exercising pendent appellate jurisdiction over the denial of a post-judgment motion to substitute counsel that could have been unreviewable without immediate appellate review).

[8] *See Byrum*, 566 F.3d at 450 (in declining pendent appellate jurisdiction, noting that the court could rule on one motion without necessarily disposing of the other); *Gros*, 209 F.3d at 437 (in declining pendent appellate jurisdiction, noting that the claims "were treated separately by the district court; each has unique elements and relevant facts").

court," and differences in facts include whether Montee gave warnings before releasing Bullet and whether the knife remained within grabbing distance once dropped. *See Gros*, 209 F.3d at 437. Because Congress has provided "statutory instructions . . . to control the timing of appellate proceedings," *Swint*, 514 U.S. at 45, we must be cautious about creating "ad hoc appellate jurisdictional rules." *Byrum*, 566 F.3d at 449. This is not the "rare and unique" case to warrant such an ad hoc exception to the normal course of review. *Id.* Accordingly, we dismiss the cross-appeal for want of jurisdiction.

## III.

We turn to whether the district court properly denied Montee QI and summary judgment on the continued-bite claim. Our review is *de novo. Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016). When reviewing the denial of summary judgment based on QI, "we have jurisdiction to 'review the materiality of any factual disputes, but not their genuineness.'" *Id.* (quoting *Hogan v. Cunningham*, 722 F.3d 725, 730–31 (5th Cir. 2013)). If there are factual disputes, "we accept the plaintiff's version." *Id.*

To overcome QI, Escobar must show (1) "a violation of an actual constitutional right," and (2) that "the right was clearly established at the time of violation." *Id.* We may address either prong first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). We begin with the former.

Escobar alleges his Fourth Amendment right was violated because he was subject to excessive force when arrested. Such excessive force claims "in the context of arrests" are analyzed under the Fourth Amendment's "objective reasonableness standard." [9] Because "police officers are often forced to make

---

[9] *Katz*, 533 U.S. at 204−05 (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)). Because the test is objective, we disregard any contentions relating to either party's subjective mental state. *See Graham*, 490 U.S. at 397 ("An officer's evil intentions will not make a

split-second judgments . . . in circumstances that are tense, uncertain, and rapidly evolving," we must not use "the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396–97. Instead, we look at the case from the perspective of a reasonable officer on the scene, paying "careful attention to the facts and circumstances of each particular case." *Id.* at 396. When viewing "the totality of the circumstances," we pay particular attention to the *Graham* factors, i.e. "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Darden v. City of Fort Worth*, 880 F.3d 722, 728–29 (5th Cir. 2018) (second quoting *Graham*, 490 U.S. at 396).

Because we construe any disputed facts in Escobar's favor, we begin by laying out the facts as properly viewed: Escobar had dropped the knife and lay flat on the ground "like a parachute man" just before being bitten; Escobar did not struggle and begged for the dog to be removed; and the bites lasted for about one minute. But the following facts are undisputed: The knife remained within Escobar's reach; Montee knew about the knife and saw that it was within Escobar's reach; Escobar's mother had called and told the police that Escobar would have to be killed; the police were rightly informed that Escobar had committed a felony assault; and Escobar had fled into the night through multiple backyards before hiding for approximately twenty minutes.

On those facts, the totality of the circumstances and the *Graham* factors establish that Montee's use of force was not objectively unreasonable. The first *Graham* factor—the severity of the offense—favors Montee. This court recently held in *Cooper*, 844 F.3d at 522, that driving under the influence is a serious offense, favoring officers. If DUI is serious, then *a fortiori* so is felony assault.

---

Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.").

The second factor—whether Escobar posed a threat—is the focus of the dispute.  According to Escobar and the district court, a reasonable jury could find that Montee allowed Bullet to continue biting after it would have been apparent "that Escobar was no longer armed and was not resisting arrest." That reasoning overlooks several key facts:  The chase was at night; Escobar had hidden from the police for twenty minutes in a neighbor's backyard; the chase, along with the warnings from Escobar's mother, would lead a reasonable officer to believe that, as he had apparently promised, Escobar would not go without a fight; and the knife remained within Escobar's reach, ready to be used.  In the face of such facts, a reasonable officer could believe that Escobar's "surrender" was a ploy and that he was ready to snatch the knife again once the dog was removed.  *See Crenshaw v. Lister*, 556 F.3d 1283, 1292–93 (11th Cir. 2009) (per curiam) (discussed *infra*).

The cases cited by Escobar are not to the contrary.  As Escobar rightly notes, we have consistently held that a suspect does not pose an immediate threat where he unambiguously surrenders by, for example, placing his hands in the air and complying with the officers' commands.  *See Darden*, 880 F.3d at 729; *Cooper*, 844 F.3d at 521–23.  Thus, in *Cooper*, 844 F.3d at 522−23, we held that officers used excessive force by permitting a dog to continue biting a suspect when they had no reason to think he had a weapon, his hands were visible, and he complied with officers' commands.  Yet even there, we cautioned that "we do not say that *any* application of force to a compliant arrestee is *per se* unreasonable."  *Id.* at 524.  And we explicitly declined to "opine on the line of reasonableness"—with good reason, as the present case reveals.  *Id.*

Although, as with the suspect in *Cooper*, Escobar's hands were visible and he complied with Montee's commands, much unlike the situation in *Cooper*, Escobar had a knife within reach, and Montee had reason to believe he

9

still posed a threat. Also unlike *Cooper*, Montee had been told that Escobar would have to be killed—by Escobar's own mother no less. A reasonable officer could easily conclude that Escobar's surrender was not genuine.

The other cases cited by Escobar are similarly distinguishable. In *Darden*, 880 F.3d at 729, the suspect had done nothing to indicate violence, and there was no suggestion of a threat. In *Newman v. Guedry*, 703 F.3d 757, 762–63 (5th Cir. 2012), the plaintiff alleged that he was tased in response to telling a joke; according to him, he was a passenger in a car pulled over for a minor traffic violation, did not attempt to flee or resist, and disobeyed no commands. And in *Bush v. Strain*, 513 F.3d 492, 501–02 (5th Cir. 2008), the suspect had been handcuffed and subdued when officers slammed her face into a car door; there was nothing to indicate she posed a threat. Although in each case we found a Fourth Amendment violation because the suspect was compliant or surrendering, in none of them would an officer have reason to doubt the suspect's compliance and still perceive a threat.[10]

Further support for that conclusion is the Eleventh Circuit's opinion in *Crenshaw*, 556 F.3d at 1292–93. There, an officer responded to reports of possibly two armed robberies; after a chase, the suspect abandoned his vehicle and fled into the woods. The suspect then yelled his location and intent to

---

[10] Escobar also cites to several out-of-circuit cases. For the same reasons as above, they are distinguishable. *See, e.g.*, *Edwards v. Shanley*, 666 F.3d 1289, 1293, 1296 (11th Cir. 2012) (finding a Fourth Amendment violation where the suspect was pulled over for failing to stop at a stop sign, fled on foot, but then stopped and yelled, "You got me. I only ran because of my license"); *Campbell v. City of Springboro*, 700 F.3d 779, 787 (6th Cir. 2012) (suspect lying on the ground with hands to his sides, but no indication of a weapon or threat); *Priester v. City of Riviera Beach*, 208 F.3d 919, 923, 927 (11th Cir. 2000) (suspect stole $20 worth of snacks, was hiding in the woods, and then stood up with his hands in the air and complied with a command to lie down; no indication of a threat when suspect was bitten); *Watkins v. City of Oakland*, 145 F.3d 1087, 1090, 1093 (9th Cir. 1998) (suspect was not believed to be armed, was hiding in a car, and was surrounded by officers with guns when bitten).

No. 17-10467

surrender, but the officer released a canine without warning. And despite screams of pain, the officer did not remove the canine until the suspect was handcuffed. Yet the court held that the officer's use of force was not excessive. *Id.* at 1292. The officer had reason to believe that the suspect of an armed robbery was armed and, given the nature of the flight and location in the woods, "it was objectively reasonable for [the officer] to question the sincerity" of the surrender. *Id.* at 1293. Moreover, although the suspect was not actively resisting while being handcuffed, the officer was not required to call off the dog until the suspect was secured because he "had no reason to trust that [the suspect] would not suddenly attempt to do him harm." *Id.*

The same is true here. Given the information from Escobar's mother and the nature of the chase (at night, through multiple backyards in a residential neighborhood), Montee had reason to doubt the sincerity of Escobar's surrender. And because the knife remained within reach, Montee could reasonably believe that Escobar—if the dog was called off before handcuffing—would then try to harm someone.[11] Accordingly, a reasonable officer could think Escobar posed a threat.

Finally, the third *Graham* factor—whether the suspect was resisting or attempting to flee—largely folds into the second. If Escobar may have posed a threat, then he also might have attempted to flee once released by the dog. Accordingly, based on all the circumstances, it was objectively reasonable to

---

[11] Also helpful to Montee is *Kuha v. City of Minnetonka*, 365 F.3d 590 (8th Cir. 2004), *abrogated in part by Szabla v. City of Brooklyn Park*, 486 F.3d 385 (8th Cir. 2007) (en banc). The suspect was pulled over for failing to dim his high-beams for oncoming traffic; he ran into a grassy swamp. Without warning, the officers released a dog, which bit the suspect. The officers did not call off the dog until the suspect put his hands up. The court found no Fourth Amendment violation, even though the suspect was nearly naked and plainly had no weapons on his person. According to the court, the officers acted reasonably because the suspect inexplicably fled in the early morning from a traffic stop; he was swimming through a swamp to avoid capture; and the officers were searching the area around the suspect during the bite to ensure there were no weapons nearby. *Id.* at 595–601.

permit Bullet to continue biting Escobar until he was fully handcuffed and subdued.  Montee did not violate Escobar's Fourth Amendment rights.

The order denying QI is REVERSED, the cross-appeal is DISMISSED, and this matter is REMANDED.