# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 22, 2025

Lyle W. Cayce
Clerk

———————————

No. 24-20399

———————————

John Bludworth Shipyard, L.L.C.,

*Plaintiff—Appellant*,

*versus*

Captain Frank Bechtolt, *Official No. 656965, Her Equipment, Appurtenances, Tackle, Etc., In Rem, also known as The Dredge*,

*Defendant*,

Manson Construction Company; Caillou Island Towing Company, Incorporated,

*Claimants—Appellees*.

———————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:22-CV-3540

———————————————————————

Before Elrod, *Chief Judge*, and Higginbotham and Southwick, *Circuit Judges*.

Leslie H. Southwick, *Circuit Judge*:

A shipyard that combined three barges — and made significant changes to the functions of two — asserted maritime liens on each of them. The district court had to interpret the federal statute that provides for a

maritime lien when "necessaries" are provided to a vessel. The court's interpretation was that the work had to provide necessaries towards the original function of a vessel, and this work was not that. Our own interpretation is that the new function must be the focus. We therefore VACATE and REMAND in part and DISMISS in part for lack of jurisdiction over additional issues.

FACTUAL AND PROCEDURAL BACKGROUND

This is an interlocutory appeal from orders in an *in rem* admiralty proceeding "determining the rights and liabilities of the parties," and the appeal is therefore authorized by 28 U.S.C. § 1292(a)(3). The suit is against three vessels: the *Captain Frank Bechtolt*, the *CIT-103*, and the *Idler Barge*. T.W. LaQuay Marine, L.L.C., now in bankruptcy, owned the *Idler Barge* and leased the *Bechtolt* and the *CIT-103* from Manson Construction Company and Caillou Island Towing Company, Inc., respectively. At LaQuay's request — and without Manson's or Caillou's knowledge or consent[1] — John Bludworth Shipyard, L.L.C. ("JBS"), performed nearly $3 million in services physically connecting the three vessels and equipping each vessel to perform its new role as part of a single dredging unit for a project along the Gulf Coast.

The three-vessel dredging unit works as follows: in front is the *Bechtolt*, which does the dredging; in the middle is the *CIT-103*, which acts as a "booster barge" to increase the *Bechtolt*'s dredging efficiency; and in the

---

[1] Manson may be implying that a no-lien clause in its contract with LaQuay necessarily prevented a maritime lien from arising on the *Bechtolt*. That implication ignores a caveat. A no-lien clause does not prevent a maritime lien from arising unless the entity providing necessaries had actual knowledge of the clause. *See Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV*, 199 F.3d 220, 225 (5th Cir. 1999).

back is the *Idler Barge*, which acts as a "spud barge" to pin the dredging unit to the seafloor while dredging. The vessels are still connected in this way.



Initially, the *CIT-103* was "a flat unpowered deck barge that loaded and transported equipment using a tugboat as motive power." Among other modifications, JBS equipped the *CIT-103* with a pump to allow it to act as a booster barge in the new three-vessel dredging unit. The record is not as clear on the former function of the *Idler Barge*, but it seems that the spud was attached to the *Idler Barge* during JBS's work. Only after JBS performed work on the three vessels were the *CIT-103* and the *Idler Barge* equipped to act as a booster barge and a spud barge, respectively. The *Bechtolt* has always been a dredge.

LaQuay went bankrupt before repaying JBS, and JBS initiated *in rem* proceedings in the United States District Court for the Southern District of Texas, asserting maritime liens on each of the three vessels for its services combining them into a single dredging unit.[2] Manson and Caillou filed claims as the owners of the *Bechtolt* and the *CIT-103*, respectively.

---

[2] The liens were asserted soon after the automatic bankruptcy stay was lifted with respect to each vessel.

No. 24-20399

The parties filed several motions in the district court. JBS moved for interlocutory sale of the three-vessel unit, arguing that the vessels were worth more connected than they would be if separated. JBS also moved for summary judgment to confirm the validity of its maritime liens on each of the three vessels. Manson and Caillou opposed both motions. Caillou moved to vacate the arrest of the *CIT-103*, or alternatively, for summary judgment.

In their briefing before the district court, Manson and Caillou each raised defenses against the maritime liens on their respective vessels. Manson argued that JBS did not have a lien on the *Bechtolt* because (1) JBS did not provide necessaries to the *Bechtolt*; and (2) JBS did not rely on the credit of the *Bechtolt*. Caillou argued that JBS did not have a lien on the *CIT-103* because (1) JBS did not provide necessaries to the *CIT-103*; (2) JBS did not rely on the credit of the *CIT-103*; and (3) any lien that JBS might have had on the *CIT-103* was extinguished by the operation of laches. Caillou's necessaries argument relied on the idea that JBS's work on the *CIT-103* did not serve the *CIT-103*'s particular function "of loading and transporting cargo as a flat unpowered deck barge." Caillou asserted that the work instead served the overall goals of the dredging project. *See Central Boat Rentals, Inc. v. M/V Nor Goliath*, 31 F.4th 320, 323–24 (5th Cir. 2022) (distinguishing a vessel's particular function from the overall goals of a project involving that vessel).

The district court denied JBS's motion for interlocutory sale of the three vessels as one unit as premature, reasoning that the unusual nature of JBS's requested sale counseled in favor of adjudicating the rights and obligations of the parties first. Five months later, the district court granted Caillou's motion to vacate the arrest of the *CIT-103* and denied JBS's motion for summary judgment to confirm its maritime liens. Specifically, the district court found that JBS did not provide necessaries to the *CIT-103* and that there were fact issues on the same point with regards to the *Bechtolt* and

the *Idler Barge*. In doing so, the district court focused only on the *CIT-103*'s old function, disregarding any new function that JBS's work might have equipped the *CIT-103* to perform. The district court did not reach Caillou's and Manson's alternative arguments. JBS appealed.

## DISCUSSION

JBS appeals these three district court rulings: (1) the grant of Caillou's motion to vacate the arrest of the *CIT-103*; (2) the denial of JBS's motion for summary judgment; and (3) the denial of JBS's motion for interlocutory sale. We will review them in that order. Our conclusion that certain rulings should be vacated is reached with the realization that this case presents an unusual set of maritime issues that has already divided this court. The court's first order denied a stay. *See John Bludworth Shipyard, L.L.C. v. Bechtolt*, No. 24-20399 (5th Cir. Oct. 29, 2024). That ruling was withdrawn on reconsideration, and a divided panel granted a stay. *See John Bludworth Shipyard, L.L.C. v. Bechtolt*, 2024 WL 4786164, at *1–4 (5th Cir. Nov. 14, 2024) (per curiam); *id.* at *4 (Oldham, J., concurring in the judgment); *id.* at *4–8 (Willett, J., dissenting). The careful work of the district court has significantly assisted us in our own labors even if we now, finally, and only in part, disagree with that court.

### I.     *Motion to Vacate the Arrest of the* CIT-103

The district court granted Caillou's motion to vacate the arrest of the *CIT-103* because it held JBS had not provided the vessel with necessaries. We review that ruling for an abuse of discretion. *Ultra Deep Picasso Pte. Ltd. v. Dynamic Indus. Saudi Arabia Ltd.*, 119 F.4th 437, 440 (5th Cir. 2024). A district court "necessarily abuse[s] its discretion if it base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990). "Whether a maritime lien exists is a question of law, reviewed *de novo*."

No. 24-20399

*Central Boat Rentals*, 31 F.4th at 323 (quoting *Comar Marine, Corp. v. Raider Marine Logistics, L.L.C.*, 792 F.3d 564, 575 (5th Cir. 2015)).

An entity has a maritime lien on a vessel if (1) it provides that vessel with necessaries (2) at the request of an authorized person. Commercial Instruments and Maritime Liens Act, 46 U.S.C. § 31342(a). The district court focused solely on the question of necessaries, so we too consider only that requirement.[3]

"Necessaries" is a term of art defined by statute to "include[] repairs, supplies, towage, and the use of a dry dock or marine railway." § 31301(4). Those terms are also terms of art. "Repairs," for example, does not refer to repairs in the usual sense of the word but has instead been construed to "include replacements, improvements and even the conversion of the vessel from one type to another as long as it is not so extensive as to amount to original construction." 2 BENEDICT ON ADMIRALTY § 38. This court defined the term "necessaries" to include

> most goods or services that are useful to the vessel, keep her out of danger, and enable her to perform her particular function. Necessaries are the things that a prudent owner would provide to enable a ship to perform well the functions for which she has been engaged . . . . What is a 'necessary' is to be determined relative to the requirements of the ship.

---

[3] Neither Caillou nor Manson have argued that LaQuay did not have authority to contract for necessaries for the vessels involved in this case.

Though the Act does not require a reliance on the credit of the vessel, this court has stated that such reliance is a requirement, though one that often is presumed. *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 605–06 (5th Cir. 1986) (*en banc*).

6

No. 24-20399

*Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 603 (5th Cir. 1986) (*en banc*).
A proper necessaries analysis focuses on a vessel's "particular function." *Id.*
A leading treatise states that

> [w]hether we characterize the process of fulfillment of such
> wants as the furnishing of repairs or supplies or necessaries, an
> essential condition for the validity of the lien is the same — the
> furnished goods and services must be reasonably needed for the
> venture in which the ship is engaged.

2 Benedict on Admiralty § 38.

In its analysis, the district court characterized the *CIT-103*'s
"particular function" as follows: "to operate as a flat unpowered deck barge
that loaded and transported equipment using a tugboat as motive power."
That was the *CIT-103*'s particular function *before* JBS did work on the vessel;
the court said the modifications to the barge did not serve the needs of that
prior purpose but instead served only the new purpose of the combined
vessels. We examine whether this singular focus on the *CIT-103*'s former
function — to the exclusion of any new function it had after the alterations
— is proper.[4]

We find guidance in a century-old Supreme Court opinion construing
the term "repairs." *New Bedford Dry Dock Co. v. Purdy* (*The Jack-O-Lantern
II*), 258 U.S. 96 (1922). The case involved the transformation of an
unpowered barge that had transported railroad cars on its flat deck into a
powered amusement vessel. *Id.* at 98–99. The record of the case filed in the

_____

[4] JBS has asserted an individual lien on each of the three vessels involved in this
case, not a single lien on the whole three-vessel unit. We evaluate this case based on the
arguments presented and do not consider whether JBS could have asserted a single lien on
the whole three-vessel unit.

Supreme Court contained a photograph of the *Jack-O-Lantern*, likely taken in the yard of New Bedford Dry Dock.



The exterior of the original railroad barge was largely unchanged, while the photograph shows the possibly completed construction of what the contract called the "Main House" and "Upper House." Transcript of Record at 4–5, *The Jack-O-Lantern II*, 258 U.S. 96 (No. 131).

The Court described the work performed by the New Bedford Dry Dock Company — the initial libelant — as follows:

> The *Jack-O-Lantern* was originally a car float of the usual type, something over 200 feet long, with neither motive power nor steering gear, and having two lines of track on her single deck. The claimant bought her and proceeded to convert her into a steamer to be used for amusement purposes. The tracks were removed, the deck relaid to make a dancing floor, a large house, or superstructure, was built, inclosing most of the deck, and containing a dance hall, rooms, balconies, etc. Steering apparatus and a steam plant of the propeller type, for propulsion, were also installed.
>
> For the purpose of carrying out these changes the contract now before the court was made between the claimant and the libelant. It covers, generally speaking, all the woodwork involved in the changes above outlined. The libelant did not install the power plant, but it did prepare the vessel for it. The scow was towed to the libelant's yard for the

No. 24-20399

> work to be done. The engine and boilers were there installed. As they were not yet in working condition when the vessel left the libelant's yard she was towed away.

*The Jack-O-Lantern II*, 258 U.S. at 98–99 (quoting *The Jack-O-Lantern* (*The Jack-O-Lantern I*), 266 F. 562, 562 (D. Mass. 1920)).

The Court held that the work was "repairs"; had the work instead been categorized as the construction of a new vessel, there would not be a maritime contract nor jurisdiction in federal court. *Id.* at 99–100. In distinguishing between "repairs and new construction," the Court rejected a rule based on "the ultimate use to which the vessel is to be devoted," instead preferring a rule based on whether the frame of the vessel remained intact.[5] *Id.* at 100. The Court remanded "to determine and enforce the rights of the parties." *Id.* The Court was primarily concerned with the jurisdiction of the district court, resolving that issue by concluding the work was conducted pursuant to a maritime contract. *Id.* at 98, 100. That conclusion

---

[5] The *Jack-O-Lantern* opinion was not the first to recognize that alterations equipping a vessel for a new purpose were "repairs" and not new construction. *See Woodworth v. Nute* (*The Iris*), 100 F. 104, 108 (1st Cir. 1900) (services "readapt[ing]" a steamer "for a trade for which she had not been originally designed" were "repairs"); *The Emma B.*, 162 F. 966, 970 (D.N.J. 1908) (services changing a boat "originally built for taking out summer excursion parties and for winter fishing" into a boat "more fit for fishing than for excursion purposes" were "repairs"); *The O. H. Vessels*, 183 F. 561, 561–62 (3d Cir. 1910) (services enclosing the deck of a freighter so that it could "carry perishable freight" instead of "coal, hay, and other materials of that character" were "repairs"); *Ocean Engine & Boiler Works, Inc. v. Olympia Shipping Corp.* (*The Harvard*), 270 F. 668, 668–71 (E.D.N.Y. 1920) (services enlarging "the superstructure and quarters" of a private yacht to make it fit for government service during World War I were "repairs"). There was at least one primary authority to the contrary. *See McMaster v. One Dredge*, 95 F. 832, 835–36 (D. Or. 1899) (converting a "scow into a dredge" constituted new construction, not repairs, because they were not "required" for the scow's former purpose as a "mere wood barge"). The *Jack-O-Lantern* opinion discussed *McMaster* and rejected its reasoning. *The Jack-O-Lantern II*, 258 U.S. at 99–100.

9

meant the district court had admiralty jurisdiction when otherwise the claims would be under state law for breach of contract. *Id.*

The Supreme Court did not explicitly state there was a maritime lien.[6] It is difficult to see, though, if this work qualified as "repairs" for purposes of forming a maritime contract, how it would not be "repairs" for purposes of creating a maritime lien. If there is a distinction, it would be because there is a gap between work that is not new construction and thus suffices to form

---

[6] The Supreme Court record provides additional details about the case. The vessel owner, Blake Purdy, almost immediately after New Bedford's libel was brought in 1920, filed a stipulation covering the value of the libel, agreed to be bound by any judgment, and obtained the release of the vessel from its arrest. Transcript of Record at 6–7, *The Jack-O-Lantern II*, 258 U.S. 96 (No. 131). After the filing of a stipulation of value, a vessel is released and "the lien on the vessel is discharged for all purposes, ceases to exist, and the release of libel bond is the sole security." *Continental Grain Co. v. Fed. Barge Lines, Inc.*, 268 F.2d 240, 244 (5th Cir. 1959) (John R. Brown, J.). The equivalent procedure is now in Rule E of the Supplemental Rules for Admiralty or Maritime Claims. FED. R. CIV. P. SUPP. ADM. R. E(5)(b). After the remand from the Supreme Court, the district court appointed an assessor "to ascertain, assess and report . . . the amount of damages to be recovered by the libellant arising from breach of contract." *New Bedford Dry Dock Co. v. Steamer "Jack-O-Lantern,"* No. 1821 (D. Mass. Dec. 7, 1922) (order appointing assessor). The district court's referral of these claims to an assessor for possible payment supports that the court held on remand that New Bedford Dry Dock had a maritime lien (or interpreted the Supreme Court as having already so held). There had to be a maritime lien because one is needed to execute against the vessel; the bond was a substitute for the vessel, and a "court can exercise [as] much authority over [the bond] as if the vessel itself were in the custody of the court, *but no more.*" *J. K. Welding Co. v. Gotham Marine Corp.*, 47 F.2d 332, 335 (S.D.N.Y. 1931) (emphasis added) (discussed in *Continental Grain*, 268 F.2d at 244 n.6). There was no later order in the court archives other than for payment of the assessor.

In 1921, another libel was filed against the *Jack-O-Lantern* based on claims arising only from its new use as an amusement barge. *See The Jack-O-Lantern* (*The Jack-O-Lantern III*), 282 F. 899, 899–900 (D. Mass. 1922) (Case No. 2051, Cruikshank libel). The later district court opinion reveals the *Jack-O-Lantern* was put into service for its new purposes and incurred new and unpaid debts, leading to a new libel and the sale of the vessel by the United States Marshal. *Id.* The proceeds from the sale of the vessel were used to pay only those later claims, not New Bedford's. *Id.*

a maritime contract and work that is "necessaries" under the maritime lien statute. Any such gap is vanishingly thin. Repairs and necessaries are terms of art in this context, as the Supreme Court in *Jack-O-Lantern* showed by quoting the original version of the federal maritime lien statute:

> that any person furnishing *repairs*, supplies, or *other necessaries*, including the use of dry dock or marine railway, to a vessel, whether foreign or domestic, upon the order of the owner or owners of such vessel, or of a person by him or them authorized, shall have a maritime lien on the vessel . . . .

*Id.* at 98 n.1 (emphasis added) (quoting Act of June 23, 1910, ch. 373, § 1, 36 Stat. 604).[7] The text of that statute describes repairs as one category of necessaries. The current version of the statute is phrased differently but is substantively the same, as it defines necessaries by reference to an illustrative list including repairs. 46 U.S.C. § 31301(4).

The *Jack-O-Lantern* case strongly supports the proposition that services converting a vessel from one purpose to another are "repairs" and therefore "necessaries." A leading admiralty treatise reaches the same conclusion, defining "repairs" to "include replacements, improvements and even the conversion of the vessel from one type to another as long as it is not so extensive as to amount to original construction." 2 BENEDICT ON ADMIRALTY § 38. As we stated above, our precedent requires a focus on the "particular function" of the vessel. *E.g.*, *Equilease*, 793 F.2d at 603. The

---

[7] The current statute authorizes maritime liens for necessaries in one section and defines necessaries as "repairs, supplies, towage, and the use of a dry dock or marine railway" in another section. 46 U.S.C. § 31342(a) (authorizing maritime liens for necessaries); § 31301(4) (defining "necessaries"). As a leading admiralty treatise notes, "no substantive change from prior maritime lien law [was] intended." 2 BENEDICT ON ADMIRALTY § 35; *see also Maritrend, Inc. v. Serac & Co. (Shipping) Ltd.*, 348 F.3d 469, 470–71 (5th Cir. 2003) (stating Congress recodified the 1910 Act in 1988 but "did not make any substantive changes to the law")

key in reconciling these principles is not to limit the particular function of the vessel to its original function. Instead, we must also consider the vessel's new function after any alterations have been made. Services converting a vessel from one function to another are thus necessaries to the extent they equip the vessel to perform its new function.[8]

The district court interpreted two of our precedents as compelling a contrary conclusion. *See Martin Energy Servs., L.L.C. v. Bourbon Petrel M/V*, 962 F.3d 827 (5th Cir. 2020); *Central Boat Rentals, Inc. v. M/V Nor Goliath*, 31 F.4th 320 (5th Cir. 2022). In one, a fuel company's vessel delivered fuel to support vessels, which in turn served as "floating gas stations" for a different set of vessels (referred to in the opinion as seismic vessels). *Martin Energy Services,* 962 F.3d at 831. The court there rejected the argument that this gave the fuel company a maritime lien on the support vessels, in part because it would "represent an unprecedented expansion" of the term "necessaries" to cover cargo in general. *Id.* at 832. Because the fuel was not

---

[8] Statutes authorizing maritime liens are to be interpreted narrowly (or "*stricti juris*"). *Valero Mktg. & Supply Co. v. M/V Almi Sun, IMO No. 9579535*, 893 F.3d 290, 292 (5th Cir. 2018). Even so, that doctrine does not bar our conclusion for two reasons. First, deciding that a vessel's new function must be considered would only recognize what should already be apparent from the case law and secondary sources; doing so would not "extend" maritime liens. The facts of this particular case may be unusual, but as the Supreme Court has instructed, "[w]hile it is true that the maritime lien is secret, hence is *stricti juris* and not to be extended by implication, this does not mean that the right to the lien is not to be recognized and upheld, when within accepted supporting principles, merely because the circumstances which call for its recognition are unusual or infrequent." *Krauss Bros. Lumber Co. v. Dimon S.S. Corp.*, 290 U.S. 117, 125 (1933). Second, the purpose of the doctrine is to protect unsuspecting third-party creditors and purchasers from secret, unrecorded liens. *See Atlantic & Gulf Stevedores, Inc. v. M/V Grand Loyalty*, 608 F.2d 197, 200–01 (5th Cir. 1979). Here, though, a reasonable third-party creditor or purchaser seeing the significant work performed directly on a vessel to allow it to serve a new purpose would not credibly be surprised to learn that the work could create a maritime lien.

used by the support vessels themselves, the fuel company had not provided those vessels with necessaries. *Id.*

In the other precedent, a vessel named the *Nor Goliath* lifted oil platform parts out of the water and lowered them onto barges as part of a project to decommission an oil rig. *Central Boat Rentals*, 31 F.4th at 322. Tugboats towed loaded barges away and brought empty barges back so that the heavy lift vessel could continue its task. *Id.* The towing companies argued that "every good or service used to decommission an oil platform was a necessary to the *Nor Goliath*." *Id.* at 324. This court rejected that view of necessaries. *Id.* The focus in deciding if a maritime lien exists is not on the overall project and all that contributes to its completion. *Id.* Adopting that view would mean that nearly all "multi-ship operations would give rise to an untenable situation where all the ships in a fleet would have liens on the other." *Id.* Instead, the focus is on the particular function of the vessel against which a lien has been asserted. *Id.* The *Nor Goliath*'s particular function was to "raise and lower the platform components," and that function was not served by the tugboats' ferrying barges back and forth. *Id.*

In both cases, the party asserting a lien provided fuel or services that may have been necessaries for *other* vessels — *i.e.*, fuel for the seismic vessels, towing services for the barges — but not for the vessels against which liens were asserted — *i.e.*, the support vessels and the *Nor Goliath*. *See Martin Energy Services*, 962 F.3d at 833; *Central Boat Rentals*, 31 F.4th at 324. These precedents simply do not address the distinct question at issue here: whether work converting a vessel from one purpose to another constitutes necessaries. Put another way, neither precedent establishes that a vessel's particular function is forever frozen in time. True, our precedents tend to phrase the definition of necessaries in the present tense, but that is just because those precedents did not involve a vessel whose function had changed. *E.g.*, *Martin Energy Services*, 962 F.3d at 833 (referring to the

"present, apparent want of the vessel" (quoting *Equilease*, 793 F.2d at 603)). Properly read, both *Martin Energy Services* and *Central Boat Rentals* merely caution against characterizing a vessel's particular function too broadly.

These two precedents establish that a vessel's particular function is examined individually, not based on the scope of an overall project. *See Central Boat Rentals*, 31 F.4th at 324. Nevertheless, a vessel's particular function might be to serve other vessels. For example, a tugboat's particular function is to tug or push other vessels. In *Martin Energy Services*, the support vessels had the particular function of transporting fuel to be used by other vessels. 962 F.3d at 830. Analogously, the *CIT-103*'s new function as a booster barge also involves other vessels: the *CIT-103* cannot boost a dredge without a dredge to boost. This dependency is not disqualifying to the creation of a maritime lien when an existing vessel is "repaired" to perform that function.

To further highlight why *Martin Energy Services* and *Central Boat Rentals* do not control, we alter their facts. In *Central Boat Rentals*, the particular function of the *Nor Goliath* was to use its crane to raise platform components out of the water and lower them onto barges for transport; that function involved other vessels. *See* 31 F.4th at 324. Though not the issue in the case, we have no doubt that repairs to its crane would be necessaries. *Martin Energy Services* provides another example: the fuel cargo did not constitute necessaries for the support vessels, but repairing their fuel tanks would serve their particular function and cause a maritime lien to arise. *See* 962 F.3d at 832. Equipping the *CIT-103* to perform its new function as a booster barge is akin to these hypothetical examples, not to the facts actually at issue in those two precedents.

We conclude, respectfully, that the district court abused its discretion when it granted Caillou's motion to vacate the arrest of the *CIT-103* based on

an erroneous view of the law — *i.e.*, that only the former function of a vessel may be considered. *Cooter & Gell*, 496 U.S. at 405. On remand, the district court should determine whether some or all of JBS's work on the *CIT-103* constituted necessaries to its new function as a booster barge and also resolve any other issues that remain relevant.

## II.    *JBS's Motion for Summary Judgment*

JBS argues we have jurisdiction to address the district court's denial of its motion for summary judgment because the district court granted Caillou's motion to vacate the arrest of the *CIT-103* in the same order. JBS insists we can reach any other issues fairly included in that order. Alternatively, JBS argues we should exercise pendent appellate jurisdiction to address the district court's denial of its motion for summary judgment.

As to the first argument, JBS relies on opinions dealing with other statutory provisions authorizing interlocutory appeals, but those provisions contain materially different language when compared with Section 1292(a)(3).[9] Even if the reasoning of those opinions applied here, deciding whether to address other issues resolved in the order is committed to our sound discretion. *See Gates v. Cook*, 234 F.3d 221, 228 n.5 (5th Cir. 2000) (explaining that resolving other issues in an appeal under Section 1292(a)(1) is discretionary); *Castellanos-Contreras v. Decatur Hotels, LLC*, 622 F.3d 393, 398–99 (5th Cir. 2010) (*en banc*) (citing opinions that the decision to reach other issues in an appeal under Section 1292(b) is discretionary). At times,

---

[9] *See Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Grp., Ltd.*, 999 F.3d 257, 263 n.1 (5th Cir. 2021) (construing 9 U.S.C. § 16(a)(1)); *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996) (construing 28 U.S.C. § 1292(b)); *BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1538 (2021) (construing 28 U.S.C. § 1447(d)); *see also In re Seabulk Offshore, Ltd.*, 158 F.3d 897, 899 n.2 (5th Cir. 1998) (construing 28 U.S.C. § 1292(a)(1)). All of these provisions refer to "orders." Section 1292(a)(3) refers to "decrees." 28 U.S.C. § 1292(a)(3).

we have characterized this discretion as though it were an exercise of pendent appellate jurisdiction, presumably because similar considerations guide our discretion. *Gates*, 234 F.3d at 228 n.5 (discussing this discretion and later stating that the panel was "exercising [its] pendent appellate jurisdiction").

Therefore, JBS's first theory for jurisdiction collapses into its second theory. The question is whether it is appropriate to exercise pendent appellate jurisdiction to determine whether JBS is entitled to summary judgment confirming its maritime liens. Pendent appellate jurisdiction is disfavored and "carefully circumscribed." *Escobar v. Montee*, 895 F.3d 387, 391 (5th Cir. 2018). Exercising pendent appellate jurisdiction is appropriate only in two circumstances: "(1) [i]f the pendent decision is 'inextricably intertwined' with the decision over which the appellate court otherwise has jurisdiction, . . . or (2) if 'review of the former decision [is] necessary to ensure meaningful review of the latter.'" *Id.* (second alteration in original) (quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 51 (1995)).

Based on those criteria, exercising pendent appellate jurisdiction would be inappropriate here. Our holding that the district court abused its discretion in granting Caillou's motion to vacate the arrest of the *CIT-103* does not compel a conclusion that JBS is entitled to summary judgment confirming its maritime liens. Indeed, we have not even decided whether JBS provided the *CIT-103* with necessaries, let alone the *Bechtolt* or the *Idler Barge*. We also have not resolved Caillou's and Manson's alternative arguments. All we have held is that the district court made a legal error in evaluating the *CIT-103*'s particular function. On remand, the district court will conduct the needed analysis. JBS asserts the remaining questions are easy to answer, so we should answer them. Simple or complex, the questions should be answered first by the district court.

### III.        *JBS's Motion for Interlocutory Sale*

Even assuming that the denial of a motion for interlocutory sale is immediately appealable (an issue we do not decide), JBS's appeal from that order was untimely: the district court denied the motion on March 18, 2024, and JBS appealed on September 6, 2024, well beyond the thirty-day limit. FED. R. APP. P. 4(a)(1)(A); 28 U.S.C. § 2107(a). True, interlocutory orders generally merge into the final judgment, but there is no final judgment here, only a later order independently subject to interlocutory appeal.[10] In this situation, the time to appeal begins on the date of the relevant order, not when the later order is entered. *See Diamond Servs. Corp. v. RLB Contracting, Inc.*, 113 F.4th 430, 439 (5th Cir. 2024). We lack jurisdiction to review the district court's order denying the motion for interlocutory sale. *See Browder v. Dir., Dep't of Corr. of Ill.*, 434 U.S. 257, 264 (1978) (noting the jurisdictional nature of the time to appeal).

Under the district court's order, JBS may move for interlocutory sale again on remand, and both the district court's earlier denial and its resolution of any renewed motion will be reviewable in an appeal from final judgment. *See* 16 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE

---

[10] *See* 15A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 3905.1 (interlocutory orders merge into final judgment for purposes of appeal). This same treatise suggests that earlier orders might merge into a decree in the same way as if it were a final judgment. *See* 16 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 3927 & nn.80–82. That suggestion appears to be at odds with our precedent. *See Diamond Servs. Corp. v. RLB Contracting, Inc.*, 113 F.4th 430, 439 (5th Cir. 2024) (measuring the time to appeal from the relevant decree, not from a later decree also subject to immediate appeal under Section 1292(a)(3)). Even so, the cases cited in the treatise treat the issue as one of pendent appellate jurisdiction. *See* 16 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 3927 n.82 (collecting cases).

Moreover, exercising pendent appellate jurisdiction would be improper given the questions we leave unresolved. *See Escobar*, 895 F.3d at 391 (discussing the circumstances in which pendent appellate jurisdiction is appropriate).

§ 3927 & n.88 (collecting cases holding that failure to take an interlocutory appeal does not forfeit review in an appeal from final judgment).

*IV.* *Conclusion*

The district court erred by considering only the *CIT-103*'s former function. We VACATE the grant of Caillou's motion to vacate the arrest of the *CIT-103* and REMAND for further proceedings. We DISMISS for lack of jurisdiction the remainder of JBS's appeal challenging the denial of JBS's motions for summary judgment and interlocutory sale.